UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>TYSON THILL,<br><br>Defendant. | 4:21-CR-40120-KES<br><br><br>REPORT AND RECOMMENDATION |

**INTRODUCTION**

Defendant Tyson Thill is before the court on an indictment charging him with receipt and distribution of child pornography and attempted production of child pornography.  See Docket No. 1.  Mr. Thill has filed a motion to suppress certain evidence.  See Docket No. 48.  The United States ("government") resists the motion.  See Docket No. 54.  This matter has been referred to this magistrate judge for holding an evidentiary hearing and recommending a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and D.S.D. LR 57.11.

**FACTS**

An evidentiary hearing was held on March 2, 2023.  Mr. Thill was there in person along with his lawyer, Assistant Federal Public Defender Matthew Powers.  The government was represented by its Assistant United States Attorney, Jeffrey Clapper.  Five witnesses testified and eleven exhibits were

received into evidence.  From this testimony and these exhibits, the court makes the following findings of fact.

## A.    The Basement Interview

On June 4, 2021, Homeland Security Investigations received a CyberTip of a Google user in South Dakota who accessed suspected child pornography. Ex. F, p. 1.  On July 28, 2021, at 8:47 a.m., Homeland Security (HSI) and South Dakota Division of Criminal Investigation (DCI) agents executed a search warrant on the home of Mr. Thill.  Id. at p. 2.  Eleven agents were present at the residence for the search.  Id.  Lead investigator, HSI Special Agent Dave Hohn, and DCI Special Agent Jackson Brown interviewed Mr. Thill at the residence.  Ex. 3, Part 1.  The conversations between Mr. Thill and SA Hohn and SA Brown were recorded.  Id.

Special Agent Hohn testified that he had planned to conduct the search between 6:30 a.m. and 7:00 a.m. but waited until 8:47 a.m. because Mr. Thill had not left the residence.  SA Hohn observed Mr. Thill's wife leaving with a couple of the children and knew that there were children still in the home.  SA Hohn testified that he decided to perform a soft approach given that children would be present for the execution of the search warrant.  SA Hohn and SA Brown, dressed in plain clothes, and Sioux Falls Police Officer, Paul Frerichs dressed in uniform, knocked on the door.  One of Mr. Thill's daughters answered.  SA Hohn asked Mr. Thill if they could have a private conversation with him away from the children and Mr. Thill agreed.  The children in the

home were sequestered to a back bedroom on the main floor.  SA Hohn and SA
Brown with Mr. Thill went to the basement of the residence.

Once in the basement, Special Agent Hohn introduced himself and
Special Agent Brown, informed Mr. Thill that they were there on a search
warrant and read Mr. Thill his <u>Miranda</u> rights.  Ex. 3, basement interview,
6:39-7:10.  SA Hohn asked Mr. Thill whether he understood his rights and if he
had any questions regarding his rights.  <u>Id.</u> at 7:12.  Mr. Thill answered, "no,"
that he did not have questions.  <u>Id.</u> at 7:13.  When asked whether Mr. Thill
would have a conversation, Mr. Thill answered, "Yeah. I, I... Yeah."  <u>Id.</u> at 7:14.
SA Hohn presented Mr. Thill with a <u>Miranda</u> waiver form and read Mr. Thill the
waiver description.  <u>Id.</u> at 7:30.  Mr. Thill signed the <u>Miranda</u> waiver.  <u>Id.</u> at
7:36-8:07; Ex. 1.  SA Hohn also signed the form, and SA Brown signed as
witness.  <u>Id.</u> at 8:17; Ex. 1.  SA Hohn informed Mr. Thill that their conversation
was being recorded.  <u>Id.</u> at 8:29.  SA Hohn told Mr. Thill that he had no
intention of arresting him that day.  Mr. Thill was being cooperative.  Ex. 4,
basement interview, p. 7 lns. 20-21.  SA Hohn and SA Brown conducted an
investigative interview with Mr. Thill that lasted approximately 56 minutes.  <u>Id.</u>
at 9:35–1:06:00.

Special Agent Hohn testified that he did not know how much sleep
Mr. Thill had gotten the night before the search.  Mr. Thill informed agents that
he had gotten home from work at 11:30 p.m. the night before and was sleeping
at the time agents came to his residence just before 9:00 a.m.  Later, after the

basement interview and before the post-polygraph interview, SA Hohn learned

that Mr. Thill's last download had been at 6:14 a.m.

Special Agent Hohn testified that he did not have any concerns that Mr.

Thill was "so tired, or anything like that, he was answering questions . . . he

was actually agitated, and drinking a caffeinated drink" while they were

talking.  SA Hohn observed Mr. Thill to be cognizant, and that Mr. Thill knew

which children were in the home, and where his wife had gone.  SA Hohn

testified that Mr. Thill understood his questions and was able to give relevant,

detailed answers.  SA Hohn testified that Mr. Thill was "nervous" during the

interview, which was standard.  SA Hohn described the conversation with Mr.

Thill as "pleasant."  SA Hohn stated that Mr. Thill never asked to stop

questioning and did not ask for a bathroom break.

Special Agent Hohn questioned Mr. Thill about his email addresses,

digital devices, applications, and digital content.  SA Hohn acknowledged that

Mr. Thill was stressed and told him to take breaths throughout the interview.

Ex. 4, basement interview, p. 7 lns. 26-29.  Mr. Thill was encouraged by

SA Hohn to get a drink when his throat was dry.  Id.  Mr. Thill drank soda

while talking with the agents.  Id. at p. 8 lns. 3-8.

When asked about his use of pornographic video games, Mr. Thill stated,

"It's, God (laughing).  I'm sorry, it's just when you . . . when you gotta, you

know, face the abyss and actually, you know, it's like confessional, facing the

priest, you know what I'm saying? Um-"  Ex. 4, basement interview, p. 11 lns.

12-16.  SA Hohn responded, "Hey, hey. Hey, I, I'm like a priest.  There's no

judgment here." Id.  Mr. Thill laughed in response.  Id.  As to SA Hohn's comment that he was "like a priest," SA Hohn testified that he was "like a priest" in that he was not passing moral judgment, and that he was there to get answers.  SA Hohn testified that it was Mr. Thill who first mentioned his priest. Later after the basement interview, SA Hohn learned that Mr. Thill had graduated from O'Gorman High School[1] in Sioux Falls.

Approximately 30 minutes into the interview, SA Hohn asked Mr. Thill for his phone passcode.  Ex. 4, basement interview, p. 20 lns. 14-17.  Mr. Thill provided the passcode to the phone.  Id.  SA Brown found Mr. Thill's Samsung phone in the basement on a tote next to the stairs.  He tested the passcode which unlocked Mr. Thill's phone.  Mr. Thill told agents that he used a hidden photo app called STOCKS for his pornography downloads.  Ex. 4, basement interview, p. 29 lns. 2-5.  Mr. Thill provided the passcode for the application which was the same as his phone passcode.  Id. at p. 45 lns. 15-16.  When SA Brown asked Mr. Thill about his passwords for his other accounts, Mr. Thill offered to change his Facebook password for the agents to "make it easy for us to remember."  Id. at p. 41 lns. 2-3.

During the basement interview, Mr. Thill made admissions of possession of child pornography but denied sexual contact or solicitation of a minor.  Id. at p. 33 lns. 4-21.  SA Hohn offered Mr. Thill an opportunity to take a tactical polygraph to address the agent's concern of the "hands-on offending."  Id. at p. 36 lns. 29-30, p. 37 lns. 1-8.

---

[1] O'Gorman High School is a Catholic High School.

**SA Hohn:** I'm not gonna judge you either way if you say yes or no. We have what's called a tactical polygraph . . . I would like to have you participate in that [polygraph] so that we can rule out that-

**Thill:** Absolutely.

**SA Hohn:** You're okay with doing that?

**Thill:** Yep.

Id.

Special Agent Hohn at the end of the interview stated, "you've calmed down. You're not shaking like you were. So, I think talking to me may . . . talking to me and Jackson's been a little bit cathartic for you, because it sounds like you have a lot of shame about what you did." Id. at p. 39 lns. 6-9. Mr. Thill responded, "Oh, God. Yes, I do." Id. Mr. Thill later told SA Kollars that at the start of the basement interview with SA Hohn, he was "almost convulsing" and probably looked like he was having a seizure but towards the end, he was "sitting calm." Ex. 4, polygraph interview, p. 24 ln 5-9. While getting pat down by SA Hohn before transport, SA Brown engaged Mr. Thill in a conversation about Mr. Thill's construction work and recent projects. Ex. 4, basement interview, p. 41 lns. 18-29, p. 42 lns. 1-23.

Mr. Thill was not under arrest. SA Hohn told Mr. Thill he needed to be handcuffed while transported to the police station for the polygraph. Id. at p. 41, lns. 4-5. Mr. Thill consented and was handcuffed with his hands in front of his body. Transport to the law enforcement center took approximately 19 minutes. The ride to the police station was not recorded. SA Hohn testified that no questions were asked about the case. Special Agent Brown and

Mr. Thill talked about lawn care and Mr. Thill's recent jobs as a contractor.

SA Hohn also testified that Mr. Thill's demeanor was good

throughout transport.

**B.    The Polygraph Interview**

Once at the law enforcement center, SA Hohn removed Mr. Thill's

handcuffs and asked Mr. Thill if he wanted to use the bathroom and get a

drink of water.  Mr. Thill used the bathroom and received a bottle of water

before entering the interview room.  SA Hohn then introduced Mr. Thill to

Special Agent Jeff Kollars with DCI.  The pre-polygraph interview with SA

Kollars was video and audio recorded.  Ex. 3, polygraph interview.  The pre-

polygraph interview and polygraph test lasted approximately 2 and a half

hours.  Ex. 3, polygraph interview.

Special Agent Kollars first informed Mr. Thill that they could take breaks

as needed and encouraged Mr. Thill to communicate his need for a break.  SA

Kollars reminded Mr. Thill that he was not under arrest and addressed

Mr. Thill's consent to the polygraph.

> **SA Kollars:** So, um, what- what we're gonna do today, uh, and it sounds like you're asking to take a polygraph to kinda stand behind some statements.

> **Thill:** Uh, yeah. I told 'em I volunteered completely, so yeah.

Ex. 4, polygraph interview, p. 1 lns. 24-26.  SA Kollars explained to Mr. Thill

his expectations for the exam.

> **SA Kollars:** You will know the results before we . . . before we leave today. . . . there's always a potential that things get reviewed and, uh, and we might have to come back.  But that's a very, very small percentage. . . . So my end goal today in talking to those guys, uh, is to

7

> make sure that- that you're not the person that's holding people down, forcing sex on newborn infants, and you know, uh, the – the drug . . . or the, uh, kingpin that is manufacturing millions of videos through the world. . . . There are mistakes that happen that lead people down a path that they otherwise wouldn't choose. . . . But my goal through the polygraph is to make sure . . . It sounds like you told them, uh, you haven't had sex with any children.

Id. at p. 2, ln. 28, p. 3 ln. 11.

> **Thill:** Nobody- nobody knew about this part of me until you guys came knocking on my door. . . . I haven't even been able to confess it to my priest 'cause my shame is so high.  I can't sit there and do that. . . . I said you guys put me in a position to where I had to.
>
> **SA Kollars:** It's- it's forced.  Right.  And-
>
> **Thill:** You know, I mean, granted, I could've sat there and lied.  But Jesus, I know that would've made everything a hell of a lot worse.

Id. at p. 3 lns. 22-23, 26-30,  p. 4 lns. 1-2.  SA Kollars testified that Mr. Thill was "forced" in the sense that he did not choose for officers to come to his home with a search warrant.

Special Agent Kollars then confirmed Mr. Thill's consent to the polygraph.  SA Kollars stated, "I need people to consent to it.  It's gotta be something that you want to do."  Id. at p 4. lns. 25-28.  Mr. Thill responded, "Yes."  Id.  SA Kollars then presented Mr. Thill with a digital copy of the polygraph authorization form that contained a Miranda warning and waiver. Ex. 2.  Mr. Thill read the form aloud in full.  Id. at p. 5 ln. 13, p. 6. 1-12. Mr. Thill engaged with the reading, pausing to get clarification on the release portion of the waiver.  Id. at p. 5 lns. 22–31, p. 6 lns. 1-10.  Mr. Thill then electronically signed the waiver.  Ex. 2.

Special Agent Kollars began questioning as to whether Mr. Thill was a suitable candidate for the polygraph.  Mr. Thill had some college education, rated his physical condition as "decent to good," and when asked how he slept the night before, he said, "uh, decent."  Ex. 4, polygraph interview, p. 8 ln. 19, p. 12 ln. 7, p. 13 lns. 3-4.  Mr. Thill had never been a patient in a mental hospital but had received therapy.  Mr. Thill disclosed that he took Adderall for ADHD but hadn't taken any that day.  Id. at p. 13 lns. 5-6, 23-27, p. 16 ln. 13.  SA Kollars testified that he had no concern about the ADHD effecting the polygraph.  SA Kollars testified that Mr. Thill was alert, had no issues communicating with him, and gave appropriate responses to questions.  SA Kollars then determined that Mr. Thill was a suitable candidate for the polygraph exam.  Id. at p. 16 lns. 19-21.

Mr. Thill made various admissions of possession of child pornography in the pre-polygraph interview with SA Kollars.  Id. at pp. 22, 27, 38.  Mr. Thill denied production of child pornography and sexual contact with a minor.  Id. at pp. 40-42.  Mr. Thill took a bathroom break before the polygraph test administration approximately 1:22:00 into the interview.  Id. at p. 43 lns. 23-30.

Mr. Thill's facial tic was noticeable throughout the interview and polygraph, starting around 16 minutes into the interview.  Ex. 3, polygraph interview, at 15:59 (Mr. Thill's face is not visible at all times of the recording, however facial tics were observed at 1:37:37, 1:46:19, 1:51:10, 2:10:00).  SA Kollars acknowledged the facial tic 1 hour and 56 minutes into the

interview after the practice polygraph and just before the actual polygraph test. Ex. 4, polygraph interview, p. 56 lns. 23-25.  At the time, he did not believe that it affected the practice test.  Id.  Mr. Thill explained that he had some tics his whole life, including involuntary blinking in his right eye.  Id. at p. 26 lns. 28-30.  SA Kollars asked if Mr. Thill thought the tics would "stop us" and Mr. Thill stated, "I wouldn't think so."  Id. at p. 58 lns. 1-4.

Mr. Thill yawned once and closed his eyes throughout the polygraph, even after being admonished by Special Agent Kollars to keep his eyes open. Ex. 3, polygraph interview, 1:55:49, 2:01:00, 2:03:00, 2:08:00, 2:09:00; Ex. 4 p. 58 ln. 15, p. 62 ln. 10.  Mr. Thill told SA Kollars that his "mind kind of just wanders a little bit" but he got quickly pulled back the second he heard the computer asking questions.  Id. at p. 59 lns. 19-22.  SA Kollars told Mr. Thill that he was "struggling to keep him" engaged during the final round of questioning, and Mr. Thill told him that he was "spaced out" and "had to be brought back to earth."  Id. at p. 63 lns. 10-15.  SA Kollars testified that he did not believe Mr. Thill was falling asleep.  At no time during the pre-polygraph interview or the polygraph test was Mr. Thill visibly sleeping.  Mr. Thill was given a break before the post-polygraph interview.  Id. at p. 63.

The post-polygraph interview lasted approximately 1 hour.  Ex. 3, post-polygraph interview.  Special Agent Kollars informed Mr. Thill that "the test shows that we're having some issues."  Ex. 4, post-polygraph interview, p. 1 lns. 15-16.  SA Kollars testified that after initially reviewing the polygraph, he made the determination of "deception indicated" because Mr. Thill had

10

provided information contrary to what was provided.  That determination was not communicated with Mr. Thill.  SA Kollars testified that after reviewing Mr. Thill's polygraph results later, he believed Mr. Thill's movements had distorted the channels collecting information.  SA Kollars testified that he now believed that the test should have been classified as "no opinion."  SA Kollars also testified that no matter what the results of the polygraph, whether "deception indicated" or "no opinion," he would have performed a post-polygraph interview for an explanation of the test results.

Special Agent Kollars performed follow up questions to the polygraph. SA Kollars told Mr. Thill that, "more than likely, at some point, there will be some sort of criminal charge out of that.  I don't know what that's gonna be. It's probably gonna be possession of child pornography, right, uh, from what you talked about."  Ex. 4, post-polygraph interview, p. 3 lns. 31-34, p. 4 lns. 1-2.  SA Kollars testified that he did utilize various interview techniques on Mr. Thill, including minimization.  SA Kollars disagreed that he offered Mr. Thill a "forced/false choice" between either accepting he was the "kingpin" of child pornography, or that Mr. Thill made a "mistake."  SA Kollars explained a "mistake" could be anywhere on that scale and that he lacks knowledge of what the interviewee has actually done.

Mr. Thill continued to deny production of child pornography or sexual contact with any child.  At the end of the interview, SA Kollars informed Mr. Thill that he couldn't stand behind Mr. Thill and say that "100%, there's no children out there that haven't been touched."  Id. at p. 14 lns. 30-31.

Mr. Thill stated that SA Kollars was "completely professional" and "awesome to talk with about the whole thing." Id. at p. 15 lns. 9-11. SA Kollars told Mr. Thill, "I'm struggling to show like any remorse from you . . . you're very well-composed . . . you're closed off." Id. at p. 19 lns. 14-20. Mr. Thill responded that he was "scared s***less." Id. SA Kollars suggested that Mr. Thill write an apology note to the unnamed child pornography subjects. Id. at p. 24 lns. 2-5. Mr. Thill expressed concern that there would be charges and he did not want to do anything to incriminate himself. Id. at p. 25 lns. 6-9. SA Kollars reminded Mr. Thill that their whole conversation had been video and audio recorded. Id. at p. 25 lns. 20-22. Mr. Thill stated, "I saw the cameras . . . I didn't know they were actually being recorded. Oh, yeah, so nevermind." Id. at p. 25 lns. 25-27.

> **SA Kollars:** I'm not gonna force you to do by any means. So if you choo-if you want to end our conversation, if you don't want to do anything, I'm not... That's-
>
> **Thill:** No, that's fine. We can keep going. I, I, I, I kind of a-I, I mean, I should've thought, or I should've asked, but I guess I didn't realize that everything was already recorded anyway, so.
>
> **SA Kollars:** Yeah. It is. I mean, and that's that's part of the, the whole process. And every interaction that you've probably had from us today, from the time that, uh-
>
> **Thill:** Well, they did tell me . . . [SA Hohn] did tell me right away when we got into the basement and everything. He goes, "I have a recorder in here," and stuff like that.

Id. at p. 26 lns. 11-24.

Mr. Thill did not write the apology letter suggested by Special Agent Kollars. SA Kollars ended the interview stating, "I'm sorry that we're on a path

that we are not able to, to get this completely resolved.  Uh, that's

unfortunate."  <u>Id.</u> p. 27 lns. 11-12.  Mr. Thill responded, "Yeah, I know."  <u>Id.</u> at

p. 27 ln. 13.

**C.    The Post-Polygraph Interview**

Special Agent Hohn conducted the final interview immediately after the

polygraph.  This interview lasted approximately 36 minutes.  Ex. 3, after

polygraph part 1.  SA Hohn first reminded Mr. Thill of his <u>Miranda</u> rights.

> **SA Hohn:** Before I s- ...Miranda stuff s-till applies.

> **Thill:** Okay.

> **SA Hohn:** If you wanna talk to me, you don't have to.  You know that.
> We've signed that. We went through the piece of paper and stuff, but it's
> all still in effect, so um, just remind you. You know, we moved here.

Ex. 4, post-polygraph part 1, p. 1 lns. 9-14.

Mr. Thill answered Special Agent Hohn's questions and continued with

the interview.  Mr. Thill made admissions to downloading a hidden camera

application.  <u>Id.</u> at p. 4 lns. 2-16.  SA Hohn told Mr. Thill that if Special Agent

Brown found more evidence on his phone and Mr. Thill hadn't disclosed it, it

would be problematic.  SA Hohn stated, "h-how do you think that's gonna look

to a prosecutor that's deciding whether or not you should be charged, or if

you're somebody that just needs treatment?"  <u>Id.</u> at p. 4 lns. 24-25.  Mr. Thill

later admitted to using the hidden camera application twice.  <u>Id.</u> at p. 7 lns. 29-

30.

> **SA Hohn:** Take a deep breath.  Does it feel better that you got that off
> your chest?  'Cause you've been holding that in all morning.

**Thill:** It does.  I honest Oh God, though, I, until you guys kept pressing, not in a bad way, I, I honestly didn't remember it until, you know, more so recently.  Actually, it was when you said your other phones, and then all of a sudden it really started click.  I was like, F***.

**SA Hohn:** So, u-I wanna back up, 'cause the way you said that, th-you were talking about pressure.  Like, you're saying it happened.  You're not saying that you feel like I tricked you.

**Thill:** You did not coerce me or trick me …

**SA Hohn:** Okay.

**Thill:** … into saying that.

**SA Hohn:** Okay.  I just want to make sure.

Id. at p. 8 lns 8-18.

After Mr. Thill's admissions, he told SA Hohn that the 6:14 a.m. download was, "a continuation of last night, I think. I stayed awake watching TV." Id. at p. 9 lns. 22-23.  This was the first and only indication of how much sleep Mr. Thill had the night before.  SA Hohn asked Mr. Thill if he would be willing to write a statement of his admissions, and Mr. Thill responded, "I believe so." Id. at p. 10 lns. 7-12.  (Mr. Thill wrote his statement in the presence of SA Hohn 23:00 minutes into the interview).  After the written statement, SA Hohn told Mr. Thill that he was not under arrest and that he would be transported back to his home.  Id. at p. 11. ln. 2-3, p. 12 ln. 12.  Mr. Thill was provided with a copy of the search warrant.  Id. at p. 11 ln. 29.  Both SA Hohn and SA Kollars spoke with Mr. Thill about his mental health and provided him their contact information if he had any concerns.  Id. at p. 12-15.

After agents left the interview room, Mr. Thill reviewed the warrant.  At 40:00 he put his head against the wall, at 42:00 he put his head down on the

14

desk.  Ex. 3, after polygraph part 1.  At 52:00 Mr. Thill took audible deep breaths, at 56:04 he was audibly snoring.  Id.  At 59:38 he was awoken by agents coming back into the room.  Id.  Subsequent video and transcript evidence were not presented.

The agents seized five cellphones, two hard drives, two tablets, and two laptops from Mr. Thill's home.  Ex. F, p. 2.

**D.    Witness Testimony**

The government called Special Agent Hohn, Special Agent Kollars, and Dr. Arica Kulm to testify at the suppression hearing.  Mr. Thill called Phillip Toft and Dr. Gregory DeClue to testify.

Dr. Arica Kulm, Director of Digital Forensics Services, who did not perform the extraction of Mr. Thill's devices, testified that the Cellebrite software is used to break passcodes to phones and applications.  Ms. Kulm testified that Cellebrite supports access to various applications, but not all applications.  She was unaware of the STOCKS application and whether Cellebrite supported it at the time of the search.  However, she testified that Cellebrite is one software out of several, such as GrayKey, that are utilized to access the content on phones.  She testified that based on the make and model of Mr. Thill's phone, extraction without a passcode would have been possible.

Phillip Toft, polygraph examiner, testified at the hearing on behalf of the defendant.  Mr. Toft had reviewed Mr. Thill's polygraph charts and the recordings of the polygraph interview to form his opinions.  Mr. Toft concluded, based on his knowledge and experience, that Mr. Thill's polygraph result

should have been, "unviable/no opinion." See Ex. B, p. 3.  Mr. Toft based this finding off Mr. Thill's involuntary or "abnormal physical" movements throughout the polygraph test.  Id.  Mr. Toft testified that he "may have" continued questioning, as SA Kollars did, whether or not Mr. Thill had been determined a nonviable candidate for the polygraph or had a "unviable/no opinion" polygraph result.  Mr. Toft did not find that Special Agent Kollars had tricked or deceived Mr. Thill.  He stated that SA Kollars' actions were appropriate under the circumstances.  Mr. Toft stated in his report that, Mr. Thill was "treated in an ethical and professional manner and was given sufficient information to understand his rights and polygraph process."  Id. at p. 3.

Gregory DeClue, Ph.D., forensic psychologist, testified at the hearing. Dr. DeClue reviewed Mr. Thill's polygraph charts and the recordings of the polygraph interview to form his opinions.  Dr. DeClue met with Mr. Thill the evening before the hearing.  Dr. DeClue made a distinction between legal and psychological voluntariness.  He testified that Mr. Thill's statements first became psychologically involuntary when SA Kollars used "force/false choice" techniques but did not express an opinion as to voluntariness under the law. In Dr. DeClue's report, he stated that "Mr. Thill was subjected to a sham procedure [polygraph] to which he had been tricked into submitting." Ex. E, p. 6.  Dr. DeClue testified that the risk factors of coercion—limited sleep, length of interrogation, police interrogation tactics—were present in the interrogation of Mr. Thill.  Dr. DeClue did not testify as to how much sleep Mr. Thill had

16

received the night before, even though he had spoken to Mr. Thill the night before his testimony and could have clarified that fact. He did state that an interrogation of five plus hours, as in this case, was a factor. He identified the following police tactics as factors: SA Kollars "forced/false choice," use of Mr. Thill's Catholic guilt by mentioning confession to his priest, promises of outcome (either prosecution or treatment), and interrupting Mr. Thill's denials.

Dr. DeClue opined extensively on false confessions and admissibility of polygraph results, both of which are outside the scope of this motion to suppress. There was no evidence that Mr. Thill's confession was false and defense counsel clarified such was not his allegation in this motion to suppress. Evidence from Mr. Thill's electronic devices confirmed the presence of child pornography and the hidden camera application Mr. Thill admitted to.

## DISCUSSION

### A.    Custodial Interrogation

The government does not dispute that Mr. Thill was in custody and was interrogated beginning with the basement interview and continuing through the post-polygraph interview. Docket No. 52-1 p. 5. Miranda warnings must be given when the defendant is in custody and subjected to interrogation. See Miranda v. Arizona, 384 U.S. 436, 475. (1966). Special Agent Hohn Mirandized Mr. Thill prior to the basement interview. Special Agent Kollars Mirandized Mr. Thill prior to the polygraph interview and exam. SA Hohn then reminded Mr. Thill of his Miranda rights prior to the post-polygraph interview. The

question before this court then is not whether <u>Miranda</u> was required.  The question is whether Mr. Thill's <u>Miranda</u> waivers were voluntary and knowing.

**B.    Validity of <u>Miranda</u> Waivers**

As a preliminary matter, the court notes that the burden rests on the government to prove by a preponderance of the evidence that a <u>Miranda</u> waiver "was an intentional, voluntary, knowing, and intelligent relinquishment or abandonment of a known right or privilege." <u>United States v. Black Bear</u>, 422 F.3d 658, 663 (8th Cir. 2005).  The determination of whether a waiver is voluntary for <u>Miranda</u> purposes is determined by the same standard used to determine whether a statement is voluntary for Fifth Amendment due process purposes.  <u>United States v. Makes Room for Them</u>, 49 F.3d 410, 414 (8th Cir. 1995).

The Supreme Court has held "that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.' " <u>United States v. Turner</u>, 157 F.3d 552, 555 (8th Cir. 1998) (citing <u>Colorado v. Connelly</u>, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).  Supreme Court decisions subsequent to <u>Connelly</u> emphasize the distinction between the elements of voluntariness and knowing.  <u>See</u> <u>Colorado v. Spring</u>, 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987).  There are "two distinct dimensions" to the inquiry whether a suspect's waiver of his <u>Miranda</u> rights was voluntary, knowing, and intelligent.  <u>United States v. Vinton</u>, 631 F.3d 476, 483 (8th Cir. 2011) (quoting <u>Moran v. Burbine</u>, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)).  First, the waiver "must have been voluntary in the sense

that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Id. Second, the suspect must have waived his rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id.

The court will "consider the totality of the circumstances, including the conduct of the officers and the characteristics of the accused, in determining whether a suspect's waiver or statements were the product of an overborne will." United States v. Daniels, 775 F.3d 1001, 1005 (8th Cir. 2014) (quoting United States v. Havlik, 710 F.3d 818, 822 (8th Cir. 2013)). "We consider, among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." Id. (quoting Sheets v. Butera, 389 F.3d 772, 779 (8th Cir. 2004)). "Even if a suspect has a somewhat diminished capacity to resist coercion due to a mental defect, however, a Miranda waiver will not be invalidated on that basis if there is no evidence of police coercion." Vinton, 631 F.3d at 483 (citing Makes Room for Them, 49 F.3d at 415)).

"The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." United States v. Anaya, 715 F. Supp. 2d 916, 935 (D.S.D. 2010) (quoting Spring, 479 U.S. at 574. "A valid waiver does not require that an individual be informed of all information useful in making his decision or all information that might . . . affec[t] his decision to confess." Id. (quoting Moran

19

v. Burbine, 475 U.S. 412, 422, 106 S.Ct. 1135 (1986) (internal quotations omitted)).

### 1.    Coercion

The Connelly Court made clear that the Court's previous decisions in Blackburn v. Alabama, 361 U.S. 199 (1960), and Townsend v. Sain, 372 U.S. 293 (1963) were still good law.  Connelly, 479 U.S. at 164-165.  In Blackburn, a defendant's statement was held to be involuntary where the police learned that the defendant had a history of mental problems and was "probably insane" at the time of his confession.  Blackburn, 361 U.S. at 207-208.  However, the evidence in that case was that the police *exploited* this weakness with coercive tactics by holding the defendant incommunicado for 8 to 9 hours of sustained interrogation in a tiny room which was, on occasion, literally filled with police. Id.  It was these coercive tactics, not the defendant's mental condition *alone,* that supported the Court's conclusion that the confession had been wrung out of the defendant against his will.  Id. at 206-207.

Similarly, in the Townsend case, police administered a truth serum to the defendant and then proceeded to wring a confession from the defendant. Townsend, 372 U.S. at 298-299.  The Connelly Court pointed out that both Blackburn and Townsend supported the Court's holding that "mere examination of the confessant's state of mind can never conclude the due process inquiry."  Connelly, 479 U.S. at 165.

Approximately six weeks after it decided Connelly, the Supreme Court issued another decision, Spring, further explaining what it meant by police

"coercion." In that case, a defendant had been told that police wanted to interrogate him about some firearms offenses. <u>Spring</u>, 479 U.S. at 566-567. The police duly advised Spring of his <u>Miranda</u> rights, which Spring waived. <u>Id.</u> Then, during the course of the interrogation, the police questioned Spring about his involvement in a murder. <u>Id.</u> at 567. Spring later argued that his waiver of his <u>Miranda</u> rights was "compelled" because he was not told at the inception that he would be questioned about the murder. <u>Id.</u> at 573. The Court rejected this argument, stating that "[h]is allegation that the police failed to supply him with certain information does not relate to any of the traditional indicia of coercion: 'the duration and conditions of detention . . ., the manifest attitude of the police toward him, his physical and mental state, the diverse pressures which sap or sustain his powers of resistance or self-control.' " <u>Id.</u> at 574 (quoting <u>Culombe v. Connecticut</u>, 367 U.S. 568, 602 (1961)).

Police tactics include "confronting suspects with false or misleading witness statements, lying repeatedly to the suspect, employing a good cop/bad cop routine, separating the suspect from nearby friends or family, using persistent and relentless questioning, giving false legal advice in an attempt to trick the suspect into a confession, or manipulating the suspect's insecurities about his surroundings," among others. <u>United States v. Jakel</u>, No. CRIM. 15-40 MJD/HB, 2015 WL 4136412, at *9 (D. Minn. July 8, 2015) (There was no coercion found when the defendant in <u>Jakel</u> was "friendly and cooperative". . . "the tone of the interview was civil and conversation, and there was periodic laughter by both defendant and detective."). Police tactics become coercive

when "the police then persuade, trick, or cajole [the defendant] out of exercising his constitutional rights."  <u>Miranda</u>, 384 at 455; <u>United States v. Griffin</u>, 922 F.2d at 1349.

In <u>United States v. Axsom</u>, the Eighth Circuit concluded no coercion had taken place when there were no "strong arm tactics or deceptive stratagems" used during questioning, the agents did not take a threatening posture toward the defendant, and there was no show of physical force.  <u>United States v. Axsom,</u> 289 F.3d 496, 502 (8th Cir. 2002).  The court also noted the defendant's testimony that the agents asked "straightforward questions" and the defendant gave "straightforward answers."  <u>Id.</u>

## 2. **Overborne Will**

The physical and mental state of the defendant is relevant to the inquiry as to what constitutes "coercion."  <u>Culombe,</u> 367 U.S. at 602.  In <u>United States v. Daniels</u>, defendant Daniels moved to suppress statements on the grounds that his <u>Miranda</u> waiver and subsequent statements were involuntary. <u>Daniels</u>, 775 F.3d at 1004.  Daniels argued that his waiver and subsequent statements to law enforcement were not voluntary due to the combination of his "intoxicated and fatigued state as well as the interviewing officers' coercive tactics."  <u>Id.</u>  The district court found that although Daniels could have been under the influence of "something," he did not slur his speech, "was oriented to time, place, and remembered specific details," and in all interactions with the officers, knew where he was and what had happened.  <u>Id.</u> at 1005.  The <u>Daniels</u>

court affirmed the lower court's finding that Daniels' <u>Miranda</u> waiver and

statements were voluntary concluding:

> Daniels answered the officers' questions coherently and intelligibly.
> He never told officers that he was confused, tired, or intoxicated,
> nor did his actions or words suggest that he felt compelled to
> speak to the officers against his will.  There was also no indication
> of coercion, threats, or promises by officers that would overbear
> Daniels' will during any portion of the interview.

<u>Id.</u> at 1005.

In <u>United States v. Turner</u>, defendant Turner moved to suppress his

statements after involuntarily and unknowingly waiving his <u>Miranda</u> rights.

<u>Turner</u>, 157 F.3d at 554.  The government argued that because there was no

evidence of police coercion, that the waiver was voluntary.  <u>Id.</u> at 555.  The

<u>Turner</u> court disagreed with the government's assertion and applied the <u>Moran</u>

two-dimension test to evaluate Turner's mental capacity at the time of the

waiver.  <u>Id.</u>  Turner cited grounds of low I.Q. and PCP-induced psychosis which

supposedly compromised his ability to waive his <u>Miranda</u> rights intelligently

and knowingly.  <u>Id.</u>  The <u>Turner</u> court rejected that argument, finding that

although Turner's I.Q. was in the low-average to borderline range he was

"clearly intelligent enough to understand his rights."  <u>Id.</u>  (citing <u>Makes Room</u>,

49 F.3d at 414).  The officer "testified that Turner was cooperative, reviewed

and initialed each admonition of the waiver form, agreed to answer questions,

and gave accurate information."  <u>Id.</u> at 555.  As to intoxication, the court

declined to adopt a *per se* rule.  <u>Id.</u> at 556.  Based on the evidence at the time

of the waiver and confession, the court concluded that Turner did not lack the

mental capacity to waive his rights.  <u>Id.</u>

Mr. Thill argues that his Miranda waivers were involuntary and unknowing during all separate periods of his custodial interrogation. Docket No. 49, p. 6. The government argues "a clear advisement [of Miranda] and waiver[s] by Thill." Docket No. 52-1 p. 6, 11-12.

### 3.    The Miranda Waiver and the Basement Interview

This court finds that there was no coercion during the basement interview between Special Agent Hohn, Special Agent Brown, and Mr. Thill. Just as in Axsom and Jakel, there was no show of force, no strong-arm tactics, and no deception. SA Hohn organized a soft approach to execute the search warrant. SA Hohn and SA Brown were dressed in plain clothes. SA Hohn waited until nearly 9:00 a.m. before executing the search warrant. Agents were considerate of Mr. Thill and his children by sequestering the children upstairs so they would not hear the conversation. Mr. Thill voluntarily went to the basement with SA Hohn and SA Brown to talk. SA Hohn informed Mr. Thill of why he was at Mr. Thill's home.

Before any questioning took place, Mr. Thill was read his Miranda rights and voluntarily, knowingly, and intelligently waived them. Even more so than the defendants in Daniels or Turner, Mr. Thill had the mental capacity to know and waive his rights. Mr. Thill had some college education. There is no evidence that he was under the influence of alcohol or narcotics. Mr. Thill had ADHD but was medicated for his condition. Special Agent Hohn could not have used Mr. Thill's supposed "lack of sleep" against him. He did not know how much sleep Mr. Thill had gotten the night before, only that Mr. Thill got home

around 11:30 p.m the night before and had awoken when agents arrived at the home around 9:00 a.m.  Mr. Thill was cognizant, was answering questions with detailed answers, was drinking a caffeinated beverage, and knew that his wife had left the home and which children she had taken with her.  Mr. Thill was also offered breaks during the interview.

Mr. Thill was nervous and shaking at the beginning of the interview but calmed down as the interview went on.  SA Hohn paused to remind Mr. Thill to breathe.  The tone of the interview was calm and conversational.  Mr. Thill and the agents engaged in small talk about Mr. Thill's work as a contractor.  There were moments the agents and Mr. Thill were joking and laughing.  This occurred when Mr. Thill told SA Hohn that he had not yet confessed to his priest, and SA Hohn said he was "like a priest," and that he was not there to pass moral judgment.  The interview occurred in Mr. Thill's own home and lasted less than an hour.  He was specifically advised that he was not under arrest and would not be arrested that day.  Although 11 officers were at the house to assist with execution of the search warrant, only two plainclothes officers were in the basement with Mr. Thill.  Based on the evidence and testimony, this court finds that Mr. Thill's waiver and subsequent statements in the basement, based on the totality of the circumstances, were voluntary, knowing, and intelligent, and should not be suppressed.

### 4.    The <u>Miranda</u> Waiver and the Polygraph Interview

This court finds that there was no coercion during the polygraph interview between Special Agent Kollars and Mr. Thill.  SA Kollars verified

25

Mr. Thill's voluntariness to take the polygraph multiple times.  Mr. Thill reiterated to SA Kollars that he "absolutely" and "voluntarily" wanted to take the polygraph.  SA Kollars was meticulous in describing the polygraph process to Mr. Thill.  Before beginning the polygraph interview, SA Kollars had Mr. Thill read his <u>Miranda</u> rights out loud.  Mr. Thill had his questions regarding the waiver clarified by SA Kollars.  Mr. Thill then voluntarily, knowingly, and intelligently signed the waiver.

Contrary to Dr. DeClue's assessment, there is no evidence that Special Agent Kollars lied or manipulated Mr. Thill to take the polygraph.  SA Kollars used minimization interview tactics on Mr. Thill when he told Mr. Thill that he wanted to make sure he wasn't the "kingpin" of child pornography or some guy who needed treatment.  These techniques did not overbear Mr. Thill's will.  There was no evidence that SA Kollars used "strong-arm" tactics.  The tone of the conversation was calm.  Mr. Thill and SA Kollars engaged in small talk.  Mr. Thill did not appear nervous and was not shaking.

SA Kollars promised that Mr. Thill would know the results of the polygraph at the end of the test.  He told Mr. Thill the results, that there were issues with the test and that he could not 100% stand by Mr. Thill's statements.  SA Kollars did not make promises about treatment or prosecution.

Mr. Thill had mental capacity to knowingly waive his <u>Miranda</u> rights.  Mr. Thill told SA Kollars that he had a "decent" amount of sleep the night before and he never told SA Kollars that he was tired or fatigued.  Mr. Thill closed his eyes momentarily throughout the polygraph, but was awake, alert,

and answering questions.  He was responsive to SA Kollars' admonishments to keep his eyes open.  Mr. Thill admitted to possession of child pornography, but significantly he continually denied sexual contact with a minor or production of child pornography throughout the interview with SA Kollars.  Mr. Thill also chose to not write the apology letter that SA Kollars suggested.  Mr. Thill's resistance to these three overtures by SA Kollars buttresses the conclusion that his free will was not overborne.  Mr. Thill had water to drink and took a bathroom break during the interview.  Although the interrogation period with SA Kollars extended for 6 hours, that time period—even if one includes the 1 hour of interrogation in Mr. Thills' basement that preceded it—is far shorter than interrogation periods found to be problematic under prior cases.

Mr. Thill was experiencing involuntary movements in his face during the interview and polygraph exam.  SA Kollars initially did not think that Mr. Thill's facial tics would be an issue.  Mr. Toft testified that such involuntary movements should have rendered the test, "no opinion."  Regardless of whether Mr. Thill was a suitable candidate for a polygraph due to his tics, or whether his results were "deception detected" or "no opinion," SA Kollars and Mr. Toft both testified that continuing to question Mr. Thill after the polygraph was proper procedure and likely.

Mr. Thill stated that SA Kollars was "completely professional" and "awesome to talk with about the whole thing."  Mr. Toft testified that SA Kollars acted reasonably under the circumstances and the polygraph interview and test were ethically performed.  Based on the evidence and testimony, this court

27

finds that Mr. Thill's waiver and subsequent statements during the polygraph interview, based on the totality of circumstances, were voluntary, knowing, and intelligent, and should not be suppressed.

### 5. The <u>Miranda</u> Reminder and the Post-Polygraph Interview

An important Supreme Court case on the issue of a defendant's Fifth Amendment rights with respect to polygraph examinations is <u>Wyrick v. Fields</u>, 459 U.S. 42 (1982). <u>Wyrick v. Fields</u> stems from a petition for writ of habeas corpus filed by Fields, who was convicted of rape in the Missouri courts in 1974. <u>Id.</u> at 43. At the time of the offense, Fields was a soldier stationed at a military fort in Missouri. <u>Id.</u> After Fields' arrest and release, he retained private defense counsel. <u>Id.</u> at 43-44. Fields then requested a polygraph examination, and the Army's Criminal Investigation Division ("CID") agreed to conduct it. <u>Id.</u> at 44. Prior to the start of the examination, the CID agent provided Fields with a written consent form advising him of his <u>Miranda</u> rights and his rights under the military code, which he signed. <u>Id.</u> In addition, the CID agent told Fields that he had the right to stop answering questions at any time and to speak to a lawyer at any time "if [he was] now going to discuss the offense under investigation, which is rape, with or without a lawyer present." <u>Id.</u> The agent asked Fields if he wanted his attorney present, and Fields said no. <u>Id.</u>

At the conclusion of the two-hour polygraph examination, the agent asked Fields to explain why the results indicated deception, and Fields admitted to having consensual intercourse with the victim. <u>Id.</u> at 44-45. The

28

agent asked Fields if he wished to discuss the matter with another CID agent and the chief of police, and Fields agreed.  Id. at 45.  The police chief re-advised Fields of his Miranda rights before this second round of questioning, and Fields repeated his statement.  Id.

The circuit court denied Fields' motion to suppress all the statements made to the two CID agents and the police chief, ruling that Fields had waived his rights, and the state court of appeals affirmed.  Id.  Fields filed a petition for writ of habeas corpus in federal court, and the district court affirmed the state courts.  Id.  However, the Eighth Circuit reversed and remanded the case on the ground that law enforcement violated the rule articulated in Edwards.[2]  Id. at 45-46.  The Eighth Circuit determined that, although Fields waived his right to have counsel present at the polygraph examination, he did not knowingly and intelligently waive his right to have counsel present at the post-polygraph interview.  Id. at 46.  The court stated that no Edwards violation would have occurred if the agent had provided "meaningfully timed Miranda warnings" before initiating the post-polygraph interview.  Id.

The Supreme Court interpreted the Eighth Circuit's ruling as establishing a *per se* rule that law enforcement "again must advise the suspect of his rights before questioning him at the same interrogation about the results of the polygraph" even if there was clear evidence that the defendant understood his rights and validly waived his rights before the polygraph.  Id. at

---

[2] Edwards v. Arizona, 451 U.S. 477 (1981).

48.  The Court rejected such a *per se* rule, finding that it was illogical that the questions asked of Fields after the polygraph concluded would have caused him to forget those rights.  Id. at 48-49.  Instead, the Court adopted the totality of the circumstances test, concluding that law enforcement did not violate Fields' Fifth Amendment rights.  Id. at 47, 49.

In reaching this result, the Court determined that, by requesting the polygraph examination, Fields initiated the interrogation and "waived his right to be free of interrogation about the crime of which he was suspected," including post-polygraph questioning, "unless the circumstances changed so seriously that his answers no longer were voluntary, or unless he no longer was making a 'knowing and intelligent relinquishment or abandonment' of his rights."  Id. at 47.  The following passage from the Fields opinion is instructive:

> The Court of Appeals relied on two facts indicating the need for a new set of warnings: the polygraph examination had been discontinued, and Fields was asked if he could explain the test's unfavorable results.  To require new warnings because of these two facts is unreasonable.  Disconnecting the polygraph equipment effectuated no significant change in the character of the interrogation.  The CID agent could have informed Fields during the examination that his answers indicated deceit; asking Fields, after the equipment was disconnected, why the answers were bothering him was not any more coercive.  The Court of Appeals stated that there was no indication that Fields or his lawyer anticipated that Fields would be asked questions after the examination.  But it would have been unreasonable for Fields and his attorneys to assume that Fields would not be informed of the polygraph readings and asked to explain any unfavorable result.  Moreover, Fields had been informed that he could stop the questioning at any time, and could request at any time that his lawyer join him. Merely disconnecting the polygraph equipment could not remove this knowledge from Fields' mind.

Id. at 47-48. See also United States v. Eagle Elk, 711 F.2d 80, 83 (8th Cir. 1983) (in a case factually similar to Wyrick but in the Sixth Amendment context, the Eighth Circuit held that the defendant waived his right to have counsel present at the post-polygraph interview when the defendant requested the polygraph, was provided with a general advisement of rights before the polygraph, and validly waived his rights and when there was no intervening circumstance that rendered his statements involuntary or his waiver unknowing and unintelligent).

A leading Eighth Circuit case on the issue of Miranda in the context of polygraph examinations is Black Bear. On November 21, 2003, FBI Agent Miller interviewed Black Bear about his son's fractured ribs, which were consistent with intentional injury. Black Bear, 422 F.3d at 660. Before the interview, Agent Miller told Black Bear that he was not under arrest, would not be arrested at the end of the interview, did not have to participate in the interview, and could terminate the interview at any time. Id. Black Bear agreed to the interview. Id.

On December 9, 2003, Black Bear appeared in tribal court for an emergency custody hearing. Id. The court appointed a public defender to represent him. Id. After the hearing, a social worker motioned Black Bear into the nearby law-enforcement center, where FBI Agent Wipperfurth waited to question him. Id. Agent Wipperfurth told Black Bear that he was not under arrest, would not be arrested at the end of the interview, did not have to participate in the interview, and could terminate the interview at any time. Id.

31

The agent also "asked" Black Bear to go to the county courthouse the next day "not as an optional appointment" for a polygraph examination.  Id.

The next morning, Black Bear went to the courthouse without counsel. Id.  He signed the standard FBI consent to interview with polygraph form, which stated that the polygraph examination was in connection with "the physical abuse of a child," and the standard FBI advice of Miranda rights form. Id.  The two agents present, Agent Trone (the polygraph examiner) and Agent Wipperfurth, signed the forms as witnesses.  Id.  Agent Trone alone administered the polygraph and then interrogated Black Bear after the polygraph concluded.  Id.  Agent Wipperfurth re-entered the room during the post-polygraph interrogation and also began to question Black Bear.  Id.  Prior to the start of this post-polygraph interview, neither agent provided additional Miranda warnings nor any advice to that effect.  Id. at 660-61.  Black Bear eventually agreed to provide a tape-recorded summary of his statements.  Id. at 661.  The entire process took a little over two hours.  Id.

Later that afternoon, Black Bear spoke to his attorney and returned home, where he telephoned the agents and indicated that he wished to speak further.  Id.  Agents Trone and Wipperfurth met Black Bear at his home, where the three spoke for 10-15 minutes.  Id.

Before trial, Black Bear moved to suppress all statements made to the FBI agents on the grounds that his Fifth and Sixth Amendment rights had been violated.  Id.  The district court denied the motion in part, and granted it

in part, suppressing only Black Bear's December 9 and 10 statements to *Agent*

*Wippurfurth* on Fifth Amendment grounds.  Id.

On appeal, the Eighth Circuit reversed, holding that none of the

statements should have been suppressed.  Id. at 664.  The Eighth Circuit

distinguished the Supreme Court's plurality opinion in Missouri v. Siebert, 542

U.S. 600 (2004),[3] as inapposite because, in Black Bear's case, Miranda

warnings had been given "at the beginning of a continuous interrogation in the

same room by the same officer who witnessed the warning at the outset."  Id.

Further, the court stated that "the key to Siebert is whether the officer's

technique was a 'designed,' 'deliberate,' 'intentional,' or 'calculated'

---

[3] In Siebert, the police arrested the defendant and began to interrogate her at
the police station.  Siebert, 542 U.S. at 604.  The interrogating officer did not
provide Miranda warnings prior to the start of the interrogation.  Id. at 604-05.
After 30-40 minutes of questioning, the defendant confessed.  Id. at 605.  The
defendant was given a 20-minute break.  Id.  The officer then turned on a tape
recorder, advised the defendant of her Miranda rights for the first time,
obtained a waiver, and then confronted her with her pre-warned statements.
Id.  While being tape recorded, the defendant repeated the incriminating
statements she had made at the start of the interview.  Id.  The defendant
moved to suppress her statements.  Id.  The officer testified at the suppression
hearing that he made a conscious decision to withhold Miranda warnings,
using the interrogation tactic of "question first, then give the warnings, and
then repeat the question 'until I get the answer that she's already provided
once.' "  Id. at 605-06.
    The state trial court suppressed the defendant's pre-warned statements
but admitted her taped statements.  Id. at 606.  A jury convicted the defendant
of second-degree murder, and, on appeal, the state court of appeals affirmed.
Id.  The state supreme court reversed, holding that, because the interrogation
was nearly continuous, the warned statements were the product of the invalid
pre-warned statements and thus all statements should have been suppressed.
Id.  In a plurality opinion, the Supreme Court affirmed, finding that the
interrogation tactic of providing Miranda warnings "midstream" violated the
purpose of Miranda.  Id. at 616-17.

circumvention of <u>Miranda</u>."  <u>Id.</u> (citing <u>Siebert</u>, 542 U.S. at 618-22) (Kennedy,

J., concurring in the judgment)).  The court found that there was no evidence

that Agent Wipperfurth intentionally or deliberately circumvented <u>Miranda</u>.  <u>Id.</u>

 The Eighth Circuit looked at the totality of the circumstances

surrounding Agent Wipperfurth's questioning, finding particularly persuasive

the fact that "Wipperfurth's questioning occurred in the same room,

continuously after the (warned) polygraph and the (admissible examining

agent's questions)."  <u>Id.</u>  Accordingly, the court likened Black Bear's case to

those cases "where after a (warned) polygraph exam, there is no *per se*

requirement for <u>Miranda</u> warnings before (admissible) post-exam questioning."

<u>Id.</u> (citing <u>Wyrick v. Fields</u>, 459 U.S. 42, 48-49 (1982); <u>McDowell v. Leapley</u>,

984 F.2d 232, 234 (8th Cir. 1993); <u>Vasser v. Solem</u>, 763 F.2d 975, 978 (8th

Cir. 1985)).

 Black Bear also argued that his waiver was not valid with respect to

Agent Wipperfurth because Wipperfurth was not the polygraph examiner.  <u>Id.</u>

at 664-65.  The Eighth Circuit rejected this argument, finding that "the change

in interrogator is not decisive."  <u>Id.</u> at 665 (citing <u>United States v. Gell-Iren</u>, 146

F.3d 827, 830-31 (10th Cir. 1998) (in rejecting the defendant's argument that

his waiver was not valid due to a change in interrogators, the court opined that

the defendant "must have known that his rights had not materially changed

simply because he... faced a new interrogator," concluding that a " '<u>Miranda</u>

warning does not lose its efficacy if a defendant is warned by one officer and

then interrogated by another.") (citation and quotation marks omitted)).  The

court also found that Agent Wipperfurth had some link to the polygraph examination in that he "arranged the exam, ordered Black Bear to attend, and witnessed the <u>Miranda</u> and polygraph warnings." <u>Id.</u> The court noted that the district court, by ruling that Black Bear's statements to Agent Trone were admissible, found that he was sufficiently informed of his rights with regard to the post-polygraph questioning. <u>Id.</u>

Within minutes of Special Agent Kollars finishing his polygraph interview of Mr. Thill, Special Agent Hohn came into the interview room to conduct the post-polygraph interview. This was approximately 5 hours and 15 minutes from the start of the basement interview. Mr. Thill was not continuously questioned. (Mr. Thill had been transported to the law enforcement center and had received several breaks during that time).

Before SA Hohn began his questioning, he reminded Mr. Thill that his <u>Miranda</u> waiver was still in effect, but that he could stop the interview at any time. As in <u>Fields</u>, SA Hohn's <u>Miranda</u> rights reminder to Mr. Thill is evidence that SA Hohn's was not trying to subvert <u>Miranda</u>. As in <u>Black Bear</u>, it did not matter that SA Hohn did not perform the polygraph or did not collect the second <u>Miranda</u> waiver from Mr. Thill. Additionally, as in <u>Fields</u>, the circumstances had not changed significantly to require re-<u>Mirandizing</u>. Mr. Thill waited moments after his interview with SA Kollars concluded to be interviewed by SA Hohn. Mr. Thill's alertness and cooperation was consistent throughout the interviews. Mr. Thill remained in the same interview room the

entire time he was at the law enforcement center except for the times he took bathroom breaks.

SA Hohn's post-polygraph interview was a continuation of the polygraph, and the <u>Miranda</u> waiver acquired by SA Kollars was still in effect. Mr. Thill's interview with SA Hohn, was also a continuation of his initial basement interview with SA Hohn. Despite this, SA Hohn reminded Mr. Thill that he could stop questioning at any time. Mr. Thill continued to engage with SA Hohn and answer questions. SA Hohn reminded Mr. Thill that he had no intention of arresting him that day. He also acknowledged that agents had woken him up and he was probably hungry. Mr. Thill did not ask SA Hohn for something to eat, he did not tell SA Hohn he was tired or fatigued, and he did not ask for a break.

The final interview like the two before, continued to be calm and conversational, lasting under one hour. Mr. Thill was alert and answering questions with relevant, detailed responses. After Mr. Thill's admissions to SA Hohn, he told the agent that he was not coerced and did not feel tricked. Mr. Thill consented to writing an admission statement. Afterward, SA Hohn and Mr. Thill discussed Mr. Thill's mental health status and the agent gave him his business card. Once SA Hohn left the room, Mr. Thill reviewed the search warrant, put his head down on the desk, and fell asleep. Mr. Thill was asleep in the interview room for approximately nine minutes. At no time before Mr. Thill falling asleep was he having difficulty answer questions or taking

direction.  An agent woke Mr. Thill when he entered the room and Mr. Thill was given a ride home.

Based on the evidence and testimony, this court finds that agents were not required to re-Mirandize Mr. Thill before the post-polygraph interview. Mr. Thill was reminded of his Miranda rights and the waiver still in effect and voluntary, knowingly, and intelligently made statements and admissions to law enforcement.  Thus, the post-polygraph statements should not be suppressed.

This court finds that the government has met its burden to demonstrate by a preponderance of the evidence that Mr. Thill's Miranda waivers were voluntary, knowingly, and intelligent.  Contrary to Dr. DeClue's assertions, although government agents did use interview tactics on Mr. Thill such as minimization, those tactics did not overcome Mr. Thill's free will.  Mr. Thill's time in custody, approximately six hours, was not unreasonable and was completely controlled by Mr. Thill.  He was not under arrest and could stop the questioning and return home at any time.  He was given breaks and was not continuously questioned during that time.  Mr. Thill first brought up his Catholic faith and continued to mention his priest at various times in the interview.  Any response from the agents concerning Mr. Thill being Catholic was conversational, not meant to trick him into admissions.  Further, agents did not promise any outcomes.  They said charges were likely, but charges would be up to the prosecutor.  They also prefaced that with discussions on treatment.  The transcript of the interviews features multiple times where Mr. Thill denied solicitation, contact with a minor, and production of child

pornography, demonstrating Mr. Thill's ability to resist the suggestions of
the agents.

The primary capacity issue raised by Mr. Thill is an alleged lack of sleep.
The evidence is devoid of how many actual hours of sleep Mr. Thill received.
Mr. Thill told Special Agent Kollars that he received a "decent" amount of sleep.
Later, Special Agent Hohn only knew that Mr. Thill had arrived at home at
11:30 p.m. and his last download was at 6:14 a.m.—there was no evidence that
Mr. Thill remained awake the entirety of that elapsed period of time.  The
search warrant was executed right before 9 a.m.  Agents observed Mr. Thill to
be alert and able to answer questions.  He fell asleep only after all three
interrogation sessions concluded.

The Supreme Court has made clear that an infirmity or mental condition
on the part of a suspect cannot, of itself, render a suspect's confession
involuntary.  Rather, a suspect's vulnerabilities only enter the analysis if the
police knew of those infirmities and acted to exploit them.  Connelly, 479 U.S.
at 160–61, 164–65 (confession not coerced where defendant exhibited no sign
of mental illness to police, but where defendant in fact confessed because
"voices" commanded him to confess—the Due Process clause requires coercive
police action); see also United States v. Rohrbach, 813 F.2d 142, 144–45 (8th
Cir. 1987) (confession was voluntary despite defendant's minimal formal
education, history of drug and alcohol abuse, and suicide attempts where there
was no corresponding coercive actions on the part of police).  Here, the

government agents could not have used Mr. Thill's alleged (but unsupported) lack of sleep against him because they had no knowledge of it.

The existing precedent outlines the type of police conduct that courts have found to be coercive. The conduct includes extreme duration and conditions of detention, the manifest attitude of police toward the defendant, pressures which sap or sustain a defendant's powers of resistance or self-control, and exploiting a defendant's mental and physical state. See Spring, 479 U.S. at 574 (quoting Culombe, 367 U.S. 568 at 602 (opinion of Frankfurter, J.)); Davis v. North Carolina, 384 U.S. 737, 739–53 (1966) (defendant held for sixteen days of incommunicado interrogation in a closed cell without windows); Blackburn, 361 U.S. 199 at 207–08 (defendant was probably insane at the time of his confession, police knew defendant had a history of mental problems, police questioned defendant for eight to nine hours of sustained interrogation in a tiny room literally filled with police, police isolated defendant from friends, relatives, or legal counsel); Reck v. Pate, 367 U.S. 433, 436–44 (1961) (defendant held for four days with inadequate food and medical attention until confession obtained); Culombe, 367 U.S. at 625–26 (1961) (defendant held for five days of repeated questioning during which police employed coercive tactics); Payne v. Arkansas, 356 U.S. 560, 561–68 (1958) (defendant held incommunicado for three days with little food and threats that a lynch mob would be admitted into the jail); Ashcraft v. Tennessee, 322 U.S. 143, 153–55 (1944) (defendant questioned by relays of officers for 36 hours without sleep).

The totality of the circumstances surrounding Mr. Thill's interrogations are very far from the kinds of cases cited above where statements were held to be involuntary.  The court concludes all three <u>Miranda</u> waivers were valid and that statements made during all interrogations were voluntary.

## C.    Inevitable Discovery

Mr. Thill moves to suppress physical evidence collected from his phones on the basis that he involuntarily disclosed his passcode and passwords at various times during the interviews.  The government responds by arguing the inevitable discovery doctrine.  This court finds that the government need not rely on inevitable discovery because the contents of the phone were legally seized.  Mr. Thill voluntarily, knowingly, and intelligently provided agents with his phone passcode and application passwords.  Nor did the government rely on Mr. Thill's statements to access his phone's content due to their investigative software.

The inevitable-discovery doctrine applies if the evidence would have been acquired by lawful means had the unlawful search not occurred but in fact was not acquired (or reacquired) by these lawful means.  <u>United States v. Baez</u>, 983 F.3d 1029, 1037 (8th Cir. 2020); <u>see</u> <u>Murray v. United States</u>, 487 U.S. 533, 539, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988).  "To prove inevitable discovery, the government must show: (1) a reasonable probability the evidence collected from the [Phone(s)] would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a

40

substantial, alternative line of investigation at the time of the constitutional violation." United States v. Glenn, 152 F.3d 1047, 1049 (8th Cir. 1998).

Police acquire evidence lawfully when it is the subject of a search warrant. Horton v. California, 496 U.S. 128, 139, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). The Supreme Court recognized the "immense storage capacity" of modern cell phones in holding that police officers must generally obtain a warrant before searching the contents of a phone. Riley v. California, 573 U.S. 373, 393, 134 S.Ct. 2473, at 2489 (2014). The contents of digital devices subject to a search warrant are lawfully discoverable through police investigation software. See United States v. Canty, 617 F. App'x 630, 632 (8th Cir. 2015).

Special Agent Hohn had a valid search warrant for Mr. Thill's home, vehicles, and digital devices. SA Hohn was authorized to seize evidence related to the child pornography investigation based on the CyberTip. Special Agent Brown found one of Mr. Thill's phones during the basement interview. Mr. Thill provided the agents with his passcode to that phone which was also the passcode to his hidden photo application, STOCKS. Ex. 4, basement interview, p. 45 lns.15-16. He was also willing to change his Facebook password for the agents. Later when searching Mr. Thill's vehicle, agents found two more phones.[4]

---

[4] The Report of investigation states that the phones seized were a Black Samsung phone, a Samsung Galaxy Note 5, and a Samsung Galaxy Note 9. Ex. F, p. 2.

Agents used a software tool called Cellebrite to recover content from Mr. Thill's devices.  Cellebrite is a forensic phone software used to access, recover, and analyze digital evidence.  Cellebrite, Digital Intelligence Glossary, https://cellebrite.com/en/glossary/forensic-phone-software/(last visited Mar. 14, 2023).  As Dr. Arica Kulm, testified, based on the make and model of Mr. Thill's phone, extraction without a passcode would have been possible under standard investigative procedures.

**D.     Fruit of the Poisonous Tree**

When a defendant is the subject of an unconstitutional search or seizure, and then a statement is obtained voluntarily and with proper advisement of rights and waiver of those rights, the primary factor to consider in determining whether the subsequent statement is "fruit of the poisonous tree" is whether, despite the illegality, the statement was the product of a clear act of free will on the part of the defendant.  Wong Sun v. United States, 371 U.S. 471, 486 (1963).  The fact that a Miranda warning was given, and a waiver obtained in between an illegal seizure and a legal statement does not alone purge the taint of the initial illegality.  Brown v. Illinois, 422 U.S. 590, 601-603 (1975).

No constitutional violations are present in this case.  Mr. Thill was Mirandized twice—before the basement interview and before the polygraph interview—and reminded of his Miranda rights before the post-polygraph interview.  Mr. Thill voluntarily, knowingly, and intelligently waived his Miranda rights twice.  Thus, there is no fruit of the poisonous tree.

42

## CONCLUSION

Based on the foregoing facts, law and analysis, this magistrate judge respectfully recommends denying Mr. Thill's motion to suppress in its entirety [Docket No. 48]. Mr. Thill voluntarily, knowingly, and intelligently waived his Miranda rights. Mr. Thill's subsequent statements including passcodes and passwords to his digital devices, and admissions should not be suppressed.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the district court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 16th day of March, 2023.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge