UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                  Plaintiff,<br><br>       vs.<br><br>TYSON THILL,<br><br>                  Defendant. | 4:21-CR-40120-KES<br><br><br>ORDER ADOPTING REPORT AND RECOMMENDATION AS MODIFIED AND DENYING THILL'S MOTION TO SUPPRESS |

Defendant, Tyson Thill, moves to suppress all of the statements he made to agents on July 28, 2021 as involuntary under the Fifth Amendment and in violation of his *Miranda* rights. *See* Docket 49 at 1. Thill also moves to suppress evidence that agents obtained from his Samsung Ultra cell phone on the ground that the agents obtained access to the phone as the result of Thill's involuntary statements under the Fifth Amendment. *Id.* The court referred Thill's motion to Magistrate Judge Veronica L. Duffy under 28 U.S.C. § 636(b)(1)(B). After holding an evidentiary hearing, Magistrate Judge Duffy recommended Thill's motion to suppress be denied in its entirety. Docket 61. Thill objects to the Report and Recommendation. Docket 81. After a de novo review of the Report and Recommendation and a review of the record, the court adopts the Report and Recommendation as modified below and denies Thill's motion to suppress.

**LEGAL STANDARD**

This court's review of a magistrate judge's report and recommendation is

governed by 28 U.S.C. § 636 and Rule 59 of the Federal Rules of Criminal Procedure. The court reviews de novo any objections to the magistrate judge's recommendations with respect to dispositive matters that are timely made and specific. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b). Because motions to suppress evidence are considered dispositive matters, a magistrate judge's recommendation regarding such a motion is subject to de novo review. 28 U.S.C. § 636(b)(1); *see also United States v. Raddatz*, 447 U.S. 667, 673 (1980). In conducting a de novo review, this court may then "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also United States v. Craft*, 30 F.3d 1044, 1045 (8th Cir. 1994).

## FACTS

After a de novo review of the suppression hearing transcript and the exhibits received into evidence,[1] the court makes the following pertinent factual

---

[1] As part of the exhibits, the court has reviewed the five audio and/or video recordings. The court refers to these recordings in the following manner:

Exhibit 3, Part 1. (Basement interview of Tyson Thill by Special Agent David Hohn and Special Agent Jackson Brown).

Exhibit 3, Part 2. (Polygraph of Tyson Thill by Special Agent Jeff Kollars).

Exhibit 3, Part 3. (Interview of Tyson Thill by Special Agent Jeff Kollars).

Exhibit 3, Part 4. (Post-polygraph interview of Tyson Thill by Special Agent Hohn—Part one).

Exhibit 3, Part 5. (Post-polygraph interview of Tyson Thill by Special Agent Hohn—Part two).

findings necessary to resolve this dispute:

On July 28, 2021, eleven officers executed a search of Thill's residence pursuant to a search warrant. *See* Docket 68 at 36. The officers arrived at Thill's home at 8:47 a.m. and three of them (Special Agent David Hohn, Special Agent Jackson Brown and Sioux Falls Police Officer Paul Frerichs) rang the doorbell. *Id;* Docket 79 at 19. Special Agent Hohn and Special Agent Brown were in plain clothes, while Officer Frerichs was in full uniform. *See* Docket 79 at 19. A young child, one of Thill's children, answered the door. *See id.* at 20; Docket 67 at 17. Thill came to the door less than a minute later. *See* Docket 79 at 20. Thill informed Special Agent Hohn and Special Agent Brown that he had "worked late last night[,]" and arrived home around 11:30 p.m. Docket 67 at 3. Thill, Special Agent Hohn and Special Agent Brown went downstairs to the basement to talk. Docket 79 at 20-21.

Before Thill made any incriminating statements, Special Agent Hohn advised Thill of his *Miranda* rights. Docket 67 at 7. After *Mirandizing* Thill, Special Agent Hohn asked Thill whether Thill was "willing to have a conversation today[.]" *Id.* Thill replied "Yeah." *Id.* Thill also signed a waiver of rights statement, which states at the bottom, "I have read, or someone has read to me, this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." Docket 66 at 1.

During the interview, Special Agent Hohn and Special Agent Brown repeatedly tried to do things to help calm Thill down, such as allowing Thill to

get a drink and encouraging Thill to take time to breathe. *See* Docket 67 at 8-9, 15, 17. Thill drank some soda during this interview. *See id.* at 9; Docket 79 at 25. Thill never asked to take a break during this interview. *See* Docket 79 at 25-26.

Special Agent Hohn testified that throughout Thill's basement interview, Thill appeared to understand the questions, "was able to give pretty good detail[,]" and gave relevant responses to the questions. Docket 79 at 24-25. After listening to the entire audio recording, the court agrees. Thill knew where his wife and two of his kids were at the time officers arrived at his home, he recounted his phone number without hesitation, and he consistently sounded alert and responsive when answering questions. *See, e.g.*, Docket 67 at 2, 10; *see generally* Exhibit 1: Part 1.

During this interview, Thill admitted to downloading sexual images of children under the age of 18 onto his phone, and then transferring them into a secret app labeled "Stocks" to avoid his own kids from seeing the images. *See* Docket 67 at 15-17; 27-33. Early in the interview, when discussing the websites that he had visited, Thill said, "I'm sorry, it's just when you . . .  when you gotta, you know, face the abyss and actually, you know, it's like confessional, facing the priest, you know what I'm saying?" *Id.* at 12. Special Agent Hohn replied, "Hey, hey, hey, I, I'm like a priest. There's no judgment here." *Id.* Similarly, when referencing his attraction to teenage, high school-aged girls and his habit of watching child pornography, Thill said, "I haven't even confessed this to my priest. I can't muster it up." *See id* at 20-21. In

addition to his admissions while in the basement interview, Thill also gave

Special Agent Hohn the passcode to Thill's Samsung Ultra phone. *See id.* at 13,

21.

In this basement interview, Thill repeatedly denied having a physical,

sexual relationship with his 16-year-old stepdaughter, and denied taking

pictures of her. *See id.* at 35-36. Thill also denied communicating with anyone

online or soliciting images or sex from any minors. *See id.* at 34. Special Agent

Hohn said that he still had "some concerns[,]" and offered Thill the opportunity

to take a "tactical polygraph[.]" *Id.* at 37-38. Special Agent Hohn said in full:

> So, here's what I'd like to offer to you. . . . I'm not gonna judge
> you either way if you say yes or no. We have what's called a
> tactical polygraph, which is just a quick polygraph that we
> can do. Because my concern is still the, the hands-on
> offending.

*Id.* at 37-38. Thill said that he "absolutely" wanted to do this polygraph. *Id.* at

38. This basement interview lasted just under an hour and a half. *See* Exhibit

3, Part 1 (recording length of 1 hour and 23 minutes).

Special Agent Jeff Kollars met with Thill after Thill arrived at the Sioux

Falls Police Department. Docket 79 at 69-70. Before Special Agent Kollars gave

any *Miranda* warnings, Thill made some potentially incriminating statements.

*See* Docket 67 at 49-52. Special Agent Kollars then had Thill read out loud a

form indicating Thill voluntarily agreed to do the polygraph examination and

advising him again of his *Miranda* rights. *Id.* at 53. Thill signed an electronic

waiver confirming that he understood he did not have to participate in the

polygraph examination and that he understood his *Miranda* rights. Docket 66

at 2. Special Agent Kollars then asked Thill questions about his medical history and background to determine whether Thill was suitable for the exam. *See* Docket 67 at 54-64. Thill told Special Agent Kollars that he had a "decent" night's sleep the night before. *Id.* at 61. Thill also said that he had attended some college. *Id.* at 56.

Special Agent Kollars informed Thill that Thill could take a break whenever, and that Thill was not under arrest. *See id.* at 49. Thill confirmed that he "volunteered completely" to take the polygraph exam. *Id.* Throughout Special Agent Kollars's interview and administration of the exam, Special Agent Kollars repeatedly asked Thill whether Thill had any questions, and told Thill multiple times that he could stop answering questions at any time. *See id.* at 50, 52, 54, 98, 100, 137. Thill also had access to water throughout his time with Special Agent Kollars and took multiple breaks throughout their interaction. *See, e.g.*, Exhibit 3, Part 2 at 14:10 (Thill drinks from water bottle); *id.* at 41:45 (same); *id.* at 1:22:35 (bathroom break); *id.* at 2:24:00 (break after exam and before post-exam interview with Special Agent Kollars); *see generally* Exhibit 3, Part 3 (water bottle on table).

Thill showed some signs of drowsiness while taking the actual polygraph examination, such as closing his eyes in-between the questions, yawning, and bobbing his head and jerking himself back awake. *See, e.g.*, Exhibit 3, Part 2 at 2:07:18; *id.* at 2:11:35; *id.* at 2:14:20; *id.* at 2:18:05; *id.* at 2:19:35; *id.* at 2:20:30; *id.* at 2:21:20. At one point, Special Agent Kollars told Thill in the middle of the examination to "keep your eyes open." Docket 67 at 111. Special

Agent Kollars testified that while he noticed Thill's eyes closing, Special Agent Kollars did not believe Thill was falling asleep. Docket 79 at 98-99. During Special Agent Kollars's post-polygraph interview, Thill appeared engaged and lucid the entire time. *See generally* Exhibit 3, Part 3.

While speaking with Special Agent Kollars, Thill repeatedly denied having sexual contact with any children or taking any sexual or pornographic videos or photos of any children. *See* Docket 67 at 88-90, 94, 101-02, 119-20, 125, 128. Thill did, however, admit to viewing child pornography, and discussed the regret he felt about his actions multiple times. *See id.* at 51, 78, 132. Special Agent Kollars recommended that Thill write a letter apologizing to the children in the child pornography, but Thill declined. *See id.* at 135-38.

Thill also stated he felt that Special Agent Kollars had acted "completely professional," and that Special Agent Kollars was "actually awesome to talk with about the whole thing." *See id.* at 126. Including the time spent talking before the polygraph, the actual polygraph examination, and the post-polygraph examination, Thill spoke with Special Agent Kollars for roughly three and a half hours. *See* Exhibit 3, Parts 2-3.

Special Agent Hohn then spoke with Thill again shortly after Special Agent Kollars. *See* Docket 79 at 33; Exhibit 3, Parts 3-4 (showing continuation of interviews). Special Agent Hohn reminded Thill that the *Miranda* warnings still applied. *See* Docket 67 at 139. Specifically, Special Agent Hohn said "if you wanna talk to me you don't have to. You know that. We've signed that. We went to the piece of paper and stuff, but it's all in effect, so, um, just [to] remind

7

you." *Id.*

Thill did not display obvious tiredness while Special Agent Hohn questioned him after the polygraph exam. *See generally* Exhibit 3, Part 4. At no point did Thill ever complain about being tired or ask to discontinue the interview.

During this interview, Special Agent Hohn said the following to Thill:

> A-and me and [Special Agent Brown] can w- try to give you the opportunity to be honest. . . . We're not trying to jam you up, and get you in more trouble. What we're trying to do is get to the truth, because if you leave here today and [Special Agent Brown] finds shit on your phone, and it turns out you've been lying to us this whole time, h-how do you think that's gonna look to a prosecutor that's deciding whether or not you should be charged, or if you're somebody that just needs treatment? . . . I don't make a decision on whether or not you get prosecuted. My job is to collect facts, and then I present those to a federal prosecutor, and he makes those decisions. 'Kay? But if I can say, "Tyson really struggled, but he ended up, he was really honest. He was cooperative, and we got to a place where he could admit to everything he had done," you know, you've already looked at treatment. You know that you need help.

Docket 67 at 142-43. Special Agent Hohn followed by saying, "I would rather you go get help than it forced upon you behind, i-in, in a jail setting, or a prison setting." *Id.* at 143. Special Agent Hohn testified at the suppression hearing that he knows that sex offenders are forced to do treatment. *See* Docket 79 at 59. Additionally, Special Agent Hohn then had the following exchange with Thill:

> Special Agent Hohn: You . . . talked about how you'd even thought about going to your . . . priest, right?
> Thill: Mm-hmm.
> Special Agent Hohn: You're Catholic?
> Thill: Yep.

8

> Special Agent Hohn: But you were ashamed?
>
> Thill: Oh, God, yes.
>
> Special Agent Hohn: 'Kay. I mean, we tal – you even talked about "Yeah, I've been doing research of, of different treatment modalities, and stuff to how I can kick this." So, I know you're struggling with this, but just like I told every addict I've ever worked with, the first step is, is admitting to what you did so you can move past it[.]

Docket 67 at 143. Moments later, which was about 11 minutes into his second interview with Special Agent Hohn, Thill confessed to taking two photos of his stepdaughter. *Id.* at 143-46; *see* Exhibit 3, part 4 at 11:00-16:30.

After admitting to taking two photos of his daughter, Thill apologized for not admitting his actions earlier. Docket 67 at 144. Thill stated, "I, honest to God, though, I, until you guys kept pressuring, not in a bad way, I, I honestly didn't remember it until you, you know more so recently." *Id.* at 146. Special Agent Hohn then asked if Thill felt like Special Agent Hohn had tricked Thill. *Id.* Thill replied, "You did not coerce me or trick me . . . into saying that." *Id.* Thill explained that he remembered taking photos of his stepdaughter once Special Agent Hohn mentioned Thill's other phones. *See id.* Thill said, "Actually, it was when you said your other phones, and then all of a sudden it really started clicking." *Id.*

Special Agent Hohn asked how old Thill's stepdaughter was at the time of the photos, and Thill replied, "Um, God, it was within the last year, 15, um." *Id.* at 145. Special Agent Hohn asked what month of the year it was, but Thill said he could not remember. *Id.* Special Agent Hohn also asked how Thill took photos of his stepdaughter, and Thill told Special Agent Hohn he could use his

9

dummy phone to control another phone, and that he placed one phone outside his stepdaughter's shower while controlling it from the living room. *Id.* at 142, 145-46. Special Agent Hohn then asked whether Thill had masturbated to the photos, and Thill responded, "No." *Id.* at 146. Thill denied taking photos of his wife or younger children in this set up. *Id.* at 146.

After admitting that he took photos of his stepdaughter, Thill repeatedly expressed guilt. *See id.* at 144 (Responding "Oh, God, yes. Oh God, yeah" to Special Agent Hohn asking whether he felt shame about his photos of his stepdaughter); *id.* at 146 (describing the "overwhelming" feelings of guilt and of "being a pile of crap"); *id.* at 147 (stating "how far I've fallen"); *id.* at 151 (Thill confirming that he believes himself to be a bad guy). Thill also agreed to write an affidavit confessing to taking photos of his stepdaughter and explaining that he deleted the photos quickly after taking them. *See id.* at 148.

## DISCUSSION

### I.   Thill's Statements to Agents

Under the Due Process Clause of the Fifth Amendment, convictions may not be based on involuntary confessions obtained through police coercion. *See United States v.* Carroll, 207 F.3d 465, 472 (8th Cir. 2000). The Fifth Amendment also requires law enforcement officers to provide *Miranda* warnings whenever suspects are subject to custodial interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 444, 467-73 (1966). After officers give such warnings, suspects may waive their rights "provided the waiver is made voluntarily, knowingly, and intelligently." *Id.* at 444. Determining whether suspects waived

their rights requires courts to consider if the waiver was 1) voluntary and 2) knowing and intelligent. *See Moran v. Burbine*, 475 U.S. 412, 421 (1986). Thill only alleges his waiver was involuntary, and thus implicitly concedes he knowingly waived his *Miranda* rights. *See* Docket 81 at 7-8.

The inquiry of voluntariness under the Due Process Clause and *Miranda* waiver are "essentially the same." *See United States v. Havlik*, 710 F.3d 818, 822 (8th Cir. 2013). In both, the court "consider[s] the totality of the circumstances, including the conduct of the officers and the characteristics of the accused, in determining whether a suspect's waiver or statements were the product of an overborne will." *Id.* (citing *Wilson v. Lawrence Cnty.*, 260 F.3d 946, 952 (8th Cir. 2001)). The government bears the burden to prove the voluntariness of a confession and waiver by a preponderance of the evidence. *See Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986).

For a confession or waiver to be involuntary, there must be "coercive police activity." *Id.* at 167. Courts also consider the personal characteristics of the accused, such as the defendant's intelligence. *See United States v. Muhlenbruch*, 634 F.3d 987, 998 (8th Cir. 2011) (noting suspect's apparent intelligence in finding confession was voluntary); *see also United States v. Maggallon*, 984 F.3d 1263, 1284 (8th Cir. 2021) (citation omitted). Ultimately, the court must determine whether "the defendant's will was overborne." *United States v. Harper*, 466 F.3d 634, 643 (8th Cir. 2006) (citation omitted). "[I]t is a rare case when a

defendant 'can make a colorable argument that a self-incriminating statement was compelled despite the fact that the law enforcement authorities adhered to the dictates of *Miranda.*' " *William v Norris*, 576 F.3d 850, 868 (8th Cir. 2009) (quoting *Simmons v. Bowersox*, 235 F.3d 1124, 1132 (8th Cir. 2001)).

The Government does not contest, and the Report and Recommendation found, that Thill was subject to custodial interrogation and thus agents were required to give *Miranda* warnings at all relevant times. *See* Docket 54 at 5; Docket 61 at 17-18. With the exception of Special Agent Kollar's pre-polygraph statement of Thill as discussed below, the court agrees. Here, agents gave the required warnings before the basement interview. *See* Docket 67 at 7; Docket 66 at 1. Thill read his *Miranda* rights out loud before Special Agent Kollar began the polygraph exam. *See* Docket 67 at 53. And Special Agent Hohn also reminded Thill of these rights after Thill completed the polygraph exam and before questioning him. *See id.* at 139.

The question is thus whether Thill voluntarily waived his *Miranda* rights and voluntarily made his confessions. The court separates the various times agents interrogated Thill.

## A. Basement Interrogation

The record shows that Thill's waiver and confessions in the basement were voluntary. Thill argues his waiver and confessions were involuntary with respect to the basement interrogation because there were eleven officers present at his home, two to three officers with Thill in the basement at various

12

times, and that the interrogation lasted well over an hour. *See* Docket 49 at 6.

Although there were eleven officers present at the home, only two of them (Special Agent Hohn and Special Agent Brown) were involved in the basement interrogation of Thill. *See* Docket 68 at 36; Docket 79 at 19-21. The two agents involved in the interrogation wore plain clothing. Docket 79 at 19. Thill was alert throughout this interrogation. *See generally* Exhibit 1, Part 1. The two agents allowed Thill to drink a soda during the interview, and repeatedly encouraged him to take a breath throughout. *See* Docket 67 at 8-9, 15, 17; Docket 79 at 25. Thill never asked to take a break during this interview, which lasted about an hour. *See* Docket 79 at 25-26, 29-30. Thill repeatedly denied having a physical, sexual relationship with his 16-year-old stepdaughter, denied taking any pictures of his step-daughter, and denied communicating with anyone online or soliciting any minor for images or sex. *See* Docket 67 at 34-36. These denials show that Thill had sufficient control over his statements such that agents did not overcome his will.

Thill also argues that the government has failed to prove Thill got any sleep the night prior to his interrogation. *See* Docket 81 at 10. But the mere fact that a suspect is tired or possibly sleep deprived, without evidence that police officers knew of and exploited this fact, is insufficient to demonstrate involuntariness. *See Connelly*, 479 U.S. at 167; *see also United States v. Casal*, 915 F.2d 1225, 1229 (8th Cir. 1990) (noting that officers were unaware that suspect had not slept for five days); *United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008) (noting officers testified that suspect "appeared awake and

coherent, and [suspect] did not tell them that he was tired, intoxicated or under the influence of drugs").

Here, during the basement interrogation, Special Agent Hohn did not know how much sleep Thill had received the night before. *See* Docket 79 at 66. In fact, when Special Agent Hohn asked Thill whether he was downstairs sleeping, Thill replied, "Yeah." *See* Docket 67 at 13. Special Agent Hohn and Special Agent Brown knew that Thill arrived home late around 11:30 p.m. that night, and Special Agent Hohn knew that Thill saved a pornographic image at 6:14 a.m. Docket 79 at 66; Docket 67 at 147. Thill said he had stayed awake watching TV, but Thill never complained about his tiredness during the basement interview. *See* Docket 67 at 147; *see generally id.* at 1-48. The court finds Thill's waiver and statements to be voluntary during the basement interviews and overrules his objection to this finding.

### B. Polygraph Examination and Post-Exam Interview with Special Agent Kollar

Before the polygraph examination and before Special Agent Kollar reminded Thill of his *Miranda* rights, Thill made some potentially incriminating statements. *See id.* at 49-52. Assuming without deciding that Special Agent Kollar would be required to repeat the *Miranda* warnings that had previously been given by Special Agent Hohn, such warnings are only required if a suspect is in custody. *See United States v. Sanchez*, 676 F.3d 627, 630 (8th Cir. 2012). The Eighth Circuit sets forth a nonexclusive, six-factor test to determine whether a suspect is in custody:

14

> (1) whether the suspect was informed at the time of
> questioning that the questioning was voluntary, that the
> suspect was free to leave or request the officers to do so, or
> that the suspect was not considered under arrest; (2) whether
> the suspect possessed unrestrained freedom of movement
> during questioning; (3) whether the suspect initiated contact
> with authorities or voluntarily acquiesced to official requests
> to respond to questions; (4) whether strong arm tactics or
> deceptive stratagems were employed during questioning; (5)
> whether the atmosphere of the questioning was police
> dominated; or, (6) whether the suspect was placed under
> arrest at the termination of the questioning.

*Id.* (quoting *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990)). The first factor "weighs heavily in favor of noncustody when officers clearly inform a suspect that [he] is free to leave or decline questioning." *Id.* (citing *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004)). Here, agents repeatedly told Thill that Thill did not have to go into the station for the polygraph examination and that Thill was not under arrest. *See* Docket 67 at 37-38, 49. Thill himself acknowledged he "absolutely" wanted to do a polygraph exam and that he "volunteered completely" to go forward with the exam. *See id.* at 38, 49. Thus, this factor weighs heavily in favor of non-custody.

Most of the other factors do too: Thill was allowed to leave at any point and had no handcuffs on while talking with Special Agent Kollars. *See generally* Exhibit 3, part 2. As discussed above, Thill voluntarily acquiesced to the agents' offer for Thill to do a polygraph exam. And agents did not place Thill under arrest on the day they questioned him. *See* Docket 79 at 24. Although Special Agent Kollars was arguably deceptive in this portion of the interview, the other factors clearly outweigh this one. *See, e.g.*, Docket 67 at 49-50

15

(Special Agent Kollars telling Thill the ultimate goal of the test was to get Thill to pass); Docket 79 at 149-50 (defense expert Dr. DeClue testifying to the deceptive nature of this framing). The court finds that Thill was not in custody and thus Special Agent Kollars did not need to *Mirandize* Thill. *See Sanchez*, 676 F.3d at 632. Thus, the court need not evaluate whether Thill voluntarily waived his *Miranda* rights during his time with Special Agent Kollars because such warnings were not even required.

But his statements must still be voluntary. *See United States v. Brave Heart*, 397 F.3d 1035, 1040 (8th Cir. 2005). The court finds all statements that Thill made to Special Agent Kollars to be voluntary. Thill was free to leave at any time. Docket 67 at 52-53. Thill said he "volunteered completely" to take the exam. *Id.* at 49. Thill has attended some college. *Id.* at 56. Thus, Thill's statements to Special Agent Kollars, before Thill consented to the polygraph exam and was reminded of his *Miranda* rights, were voluntary.

Thill's statements after he filled out the consent form to participate in the polygraph examination and orally stated his *Miranda* rights are also voluntary. *See id.* at 53-54; Docket 66 at 2. Thill stated towards the end of his talk with Special Agent Kollars that Special Agent Kollars had acted "completely professional", and that Special Agent Kollars was "actually awesome to talk with about the whole thing." *See id.* at 126. Thill had access to water throughout this time period and took multiple breaks. *See, e.g.*, Exhibit 3, part 2 at 14:10 (Thill drinks from water bottle); *id.* at 41:45 (same); *id.* at 1:22:35 (bathroom break); *id.* at 2:24:00 (break after exam and before post-exam

16

interview with Special Agent Kollar); *see generally* Exhibit 3, part 3 (water bottle on table). Thill repeatedly denied having sexual contact with any children or taking any sexual or pornographic videos or photos of any children. *See* Docket 67 at 88-90, 94, 101-02, 119-20, 125, 128. These denials show that his will was not overborne. *See United States v. Gannon*, 531 F.3d 657, 661 (8th Cir. 2008) (noting courts must consider the defendant's capacity to resist pressure). This denial stands in contrast to Thill's admission that he viewed child pornography and regretted his actions multiple times. *See* Docket 67 at 51, 78, 132. These factors all point to Thill's statements being voluntary.

Although Thill showed some signs of drowsiness during the actual polygraph examination and although Special Agent Kollars had to tell Thill to "keep your eyes open" during the exam, Special Agent Kollars did not believe Thill was falling asleep. *See, e.g.*, Exhibit 3, part 2 at 2:07:18; *id.* at 2:11:35; *id.* at 2:14:20; *id.* at 2:18:05; *id.* at 2:19:35; *id.* at 2:20:30; *id.* at 2:21:20; Docket 67 at 111; Docket 79 at 98-99. This belief was justified because Thill told Special Agent Kollars that he had a "decent" night's sleep the night before he also never asked to take a break due to feeling tired. *See* Docket 67 at 61; *see generally* Exhibit 3, part 2, 3. After the polygraph exam, Thill appeared alert and engaged during his post-polygraph discussion with Special Agent Kollars. *See generally* Exhibit 3, part 3. Without more, the court does not find that Special Agent Kollars exploited Thill's tiredness. In fact, Special Agent Kollars proposed the idea for Thill to have a break in between the polygraph exam and the post-exam interview. *See* Docket 67 at 111. Thus, the court concludes that

17

Thill's statements to Special Agent Kolllar, both before, during, and after his polygraph exam, were voluntary.

### C. Post-Polygraph Exam Interview with Agent Hohn

Next, the court considers whether Thill's *Miranda* waiver and statements to Special Agent Hohn after the polygraph exam were voluntary. The Eighth Circuit's decision in *United States v. Lebrun*, 363 F.3d 715 (8th Cir. 2004), provides a helpful starting place. In *Lebrun*, after agents questioned a suspect for just over thirty minutes, the suspect confessed to strangling the victim. *See* 363 F.3d at 724. The Government admitted that agents used psychological pressure to facilitate a confession. *Id.* Additionally, although agents did not read the suspect his *Miranda* rights, agents had previously interviewed him three times and the suspect testified that he was aware of his rights. *See id.* at 717-18, 726. The suspect was "a sophisticated individual with legal training" due to having attended five years of college and one year of law school, and "did not display any unique sensitivity that would indicate that the agents might overbear his will." *Id.* at 726.

The agents also stated that if the suspect made an admission, it was possible that he would not be prosecuted. *See id.* at 724-25. On this point, the district court concluded that the suspect *believed* he would not be prosecuted if he confessed but did not conclude whether agents did in fact make that promise given their use of the word "possible." *See id.* The Eighth Circuit clarified that the relevant inquiry is not whether the suspect subjectively believed agents made a promise, but rather whether a reasonable person would

18

interpret the agents' statements as a promise. *See id.* For its analysis, the Eighth Circuit assumed without deciding that a reasonable person would view the agents' statements as a promise. *See id.*

The *Lebrun* Court held the suspect's confessions to be voluntary. *Id.* at 727. In doing so, it emphasized that the mere fact that agents made a promise of leniency does not necessarily require a finding of involuntariness. *See id.* at 725-26. It explained that "it is not enough to show that the authorities' representations were the but for cause of a confession." *Id.* at 725. Rather, the "polestar always must be to determine whether or not the authorities overbore the defendant's will and critically impaired his capacity for self-determination." *Id.* Placing "substantial weight" on the interview being only thirty-three minutes and that the suspect was a sophisticated individual with legal training, and significant weight on the suspect's understanding of his *Miranda* rights and that he did not display any unique sensitivity that would indicate agents would overbear his will, the Court determined his confessions to be voluntary. *See id.* at 726-27.

Although Thill's case presents a similar situation to the one in *Lebrun*, Thill's statements to Special Agent Hohn after the polygraph examination are arguably a closer call than the one in *Lebrun*. The court first discusses the similarities. First, the suspect in *Lebrun* understood his *Miranda* rights. *See id.* at 726. Similarly here, although Special Agent Hohn did not read Thill the *Miranda* warnings again, Special Agent Hohn reminded Thill that they still applied. *See id.* at 726; Docket 67 at 139. Specifically, Special Agent Hohn said

"if you wanna talk to me, you don't have to. You know that. We've signed that. We went to the piece of paper and stuff, but it's all in effect, so, um, just [to] remind you." Docket 67 at 139. All of the evidence in the record points to Thill understanding his *Miranda* rights at all times.

Second, the suspect in *Lebrun* had no mental defects but rather had at least average intelligence given he studied for one year in law school. *See Lebrun*, 363 F.3d at 726. Similarly, although Thill had no legal background, the court concludes that he has at least average intelligence based on the court's observations of Thill's interactions with agents and the fact that he has attended "some college." *See* Docket 67 at 56.

Third, the implied promise Special Agent Hohn made to Thill is similar to the promises in *Lebrun*. In *Lebrun*, the agents promised the suspect that if he confessed to spontaneously killing the victim, "you will not be prosecuted." *See Lebrun*, 363 F.3d at 725. Another agent said immediately afterwards, "That's absolutely right." *Id.* The agents had qualified their representations by saying it was only "possible" that the suspect would not be prosecuted. *Id.* Here, Special Agent Hohn said the following to Thill:

> A- and me and [Special Agent Brown] can w- try to give you the opportunity to be honest. . . . We're not trying to jam you up, and get you in more trouble. What we're trying to do is get to the truth, because if you leave here today and [Special Agent Brown] finds shit on your phone, and it turns out you've been lying to us this whole time, h-how do you think that's gonna look to a prosecutor that's deciding whether or not you should be charged, or if you're somebody that just needs treatment? . . . I don't make a decision on whether or not you get prosecuted. My job is to collect facts, and then I present those to a federal prosecutor, and he makes those decisions.

'Kay? But if I can say, "Tyson really struggled, but he ended up, he was really honest. He was cooperative, and we got to a place where he could admit to everything he had done," you know, you've already looked at treatment. You know that you need help.

Docket 67 at 142-43. Special Agent Hohn continued by stating, "I would rather you go get help than it forced upon you behind, i-in, in a jail setting, or a prison setting." *Id.* at 143. At the suppression hearing, Special Agent Hohn admitted that he knows that sex offenders are forced to do treatment. Docket 79 at 59. When Special Agent Hohn told Thill that Special Agent Hohn would rather Thill get help than it being forced in a prison setting, and when Special Agent Hohn linked getting help with being honest and as an alternative to being prosecuted, Special Agent Hohn implied that Thill might not be prosecuted if Thill was honest and confessed. Thus, although Special Agent Hohn said that it was ultimately the prosecutor's decision to press charges, a reasonable person could interpret Special Agent Hohn, at the very least, implying to Thill that if Thill confessed, he might not go to prison. *See* Docket 67 at 143.

But there are some important differences in Thill's situation compared to *Lebrun*. Unlike in *Lebrun*, agents interviewed Thill for much longer than 33 minutes. Excluding the time Thill talked with Agent Kollar,[2] Special Agent Hohn and Special Agent Brown had talked with Thill for just under an hour and a half in the basement. *See* Exhibit 3, Part 1 (recording length of 1 hour

---

[2] As discussed above, Thill voluntarily chose to participate in the polygraph exam and thus the length of all of Thill's interviews partially resulted from Thill's own choice.

and 23 minutes). Special Agent Hohn then started another interrogation with Thill that same day, right after Thill had completed a polygraph exam. *See* Docket 79 at 33; Exhibit 3, Parts 2-4 (showing no break in time in-between polygraph exam and Special Agent Hohn's interrogation). About 11 minutes into the second interrogation, Thill confessed to photographing his stepdaughter coming out of the shower twice. *See* Exhibit 3, Part 4 at 11:00-16:30. Thus, the length of time Thill was interrogated was at least an hour and a half, nearly three times longer than the suspect in *Lebrun*. *See* 363 F.3d at 726. And although this factor favors a finding of involuntariness, the length of the interview is not dispositive. *See Williams v. Norriss*, 576 F.3d 850, 868-69 (8th Cir. 2009) (concluding thirteen hour interrogation was not involuntary).

Thill's case also differs from *Lebrun's* because unlike in *Lebrun*, Thill arguably had a "unique sensitivity that would indicate that the agents might overbear his will." *See Lebrun*, 363 F.3d at 726. Here, the court finds that Thill had limited sleep, and the agents at the very least should have suspected that Thill was tired. Specifically, Special Agent Hohn knew that Thill had gotten home late the night before at 11:30 pm and knew that Thill had downloaded a pornographic image around 6:15 a.m. *See* Docket 67 at 3, 147. Special Agent Kollar also noticed Thill closed his eyes during the polygraph exam because Special Agent Kollar specifically told Thill to "[k]eep your eyes open" during the exam. *See id.* at 111.[3] But although tiredness is a factor, Thill did not display

---

[3] Thill later fell asleep in the interrogation room after confessing to filming his stepdaughter. *See* Exhibit 3, Part 4 at 49:00. But this fact is of limited value because agents could not have seen him sleeping before his confession because

obvious tiredness when Special Agent Hohn questioned him after the polygraph exam. *See generally* Exhibit 3, Part 4. At no point did Thill ever complain about being tired or ask to discontinue the interview. Thus, although the court recognizes and considers Thill's tiredness, the court finds it to be non-dispositive. *See Gaddy*, 532 F.3d at 788 (finding suspect gave voluntary statements despite suspect having sleepless night because suspect appeared "awake and coherent" and suspect did not tell officers he was tired).

Finally, unlike in *Lebrun*, agents here repeatedly referenced Thill's Catholicism by making references to priests after Thill had discussed not being able to tell his priest about his actions. *See* Docket 67 at 12, 21, 51, 126, 143. Thill first brought up confessing to a priest early on during his interview with Special Agent Hohn in the basement, when Thill said, in reference to discussing the pornographic games he played on his phone, "I'm sorry, it just when you . . . when you gotta, you know, face the abyss and actually, you know, it's like confessional, facing the priest, you know what I'm saying?" *Id.* at 12. Special Agent Hohn then responded, "Hey, hey. Hey, I, I'm like a priest. There's no judgment here." *Id.* Thill stated later in the basement interview that he hasn't "even confessed this to my priest. I can't muster it up." *Id.* at 21. Thill told Special Agent Kollars the same thing. *Id.* at 51. When Special Agent Hohn interrogated Thill for a second time after Thill completed the polygraph exam, and after Special Agent Hohn implied Thill might not be prosecuted if Thill

---

it occurred *after* the interrogation was over. *See Gaddy*, 532 F.3d at 788 (discussing officers' knowledge of suspect's sleeplessness to be important).

confessed, Special Agent Hohn then had the following exchange with Thill:

> Special Agent Hohn: You . . . talked about how you'd even thought about going to your . . . priest, right?
> Thill: Mm-hmm.
> Special Agent Hohn: You're Catholic?
> Thill: Yep.
> Special Agent Hohn: But you were ashamed?
> Thill: Oh, God, yes.
> Special Agent Hohn: 'Kay. I mean, we tal – you even talked about "Yeah, I've been doing research of, of different treatment modalities, and stuff to how I can kick this." So, I know you're struggling with this, but just like I told every addict I've ever worked with, the first step is, is admitting to what you did so you can move past it[.]

*Id.* at 143. Moments later, Thill confessed to photographing his stepdaughter.

*Id.* at 143-46.  Appeals to religion can be coercive, but they are not dispositive.

*See Williams*, 576 F.3d at 868 (finding state's conclusion that confession was

voluntary to be reasonable despite officers quoting Bible plus 13 hour

interrogation and promises of leniency); *see also Barrera v. Young*, 794 F.2d

1264, 1270-71 (7th Cir. 1986) ("[W]hen a suspect is psychologically prepared

for interrogation, and has a lawyer seconds away, a 45 minute monologue

including appeals to religion and reminders that the state's evidence is strong

does not make the ensuring confession involuntary."). Here, Special Agent

Hohn's reference to Thill's priest was brief and one of many things that Special

Agent Hohn said to Thill throughout the day. Thus, the mere fact that Special

Agent Hohn brought up Thill's priest does not render Thill's statements

involuntary.

　　　To be sure, the court is mindful of the fact that the involuntariness

inquiry must look at the totality of circumstances. *See Muhlenbruch*, 634 F.3d

at 997-98. Thus, while one single factor (such as the length of interrogation, sleeplessness, implied promises, and appeals to religion) may not alone be sufficient, together they may be sufficient such that the Government has failed to meet its burden to prove the suspect made the statements voluntarily. The court also recognizes that Thill called an expert in interrogations and confessions, Dr. Gregory DeClue,[4] who testified about the risk factors (such as fatigue, length of interrogation, and certain techniques officers use) in making a statement involuntary. *See* Docket 79 at 129, 156-60. But after considering the totality of the circumstances, the court still finds that Thill's confessions were voluntary.

In addition to the factors discussed above (such as the fact that Thill knew his *Miranda* rights, had some college education, had access to water, never asked agents to stop questioning, had several breaks, and voluntarily chose to do a polygraph exam), the court finds Thill's actions and statements throughout the interview to be significant. For example, after admitting to photographing his daughter, Thill reflected on why he did not remember his actions earlier. *See* Docket 67 at 146. Thill stated, "I, honest to God, though, I, until you guys kept pressuring, not in a bad way, I, I honestly didn't remember

---

[4] Dr. DeClue testified about multiple interrogation techniques that Special Agent Kollars used and about how they contributed to Thill's confessions being involuntary. *See* Docket 79 at 146-50, 156. But for the reasons described below, the court finds that even if these tactics may have been coercive to an extent, the agents did not overbear Thill's will and thus Thill's statements were still voluntary. *See Williams*, 576 F.3d at 868 (concluding that even though some factors may point to coercion, the key question is whether the coercion overbore the suspect's will).

it until you, you know more so recently." *Id.* Special Agent Hohn followed up to ask if Thill felt like Special Agent Hohn had tricked Thill, to which Thill replied, "You did not coerce me or trick me . . . into saying that." *Id.*

Instead, Thill explained that he remembered taking photos of his stepdaughter once Special Agent Hohn brought up Thill's other phones. *See id.* Thill said, "Actually, it was when you said your other phones, and then all of a sudden it really started clicking." *Id.* Thill's own statements explain that, rather than agents coercing him to say anything, he remembered his actions with his stepdaughter once the agents brought up his other phones—something that they had never discussed other than right before his confession. The court finds Thill's explanations important in determining whether he made his statements voluntarily.

Thill also continued to give details about photographing his stepdaughter that none of the agents had specifically mentioned. For example, Special Agent Hohn asked how old Thill's stepdaughter was at the time, and Thill replied, "Um, God, it was within the last year, 15, um." *Id.* at 145. Special Agent Hohn also asked how Thill photographed his stepdaughter, and Thill detailed his methods. *See id.* at 142, 145-46. The fact that Thill continued to give details about his actions that agents did not initially supply shows that Thill was not simply going along with whatever the agents said.

Thill did not answer some questions and denied some allegations as well. When Special Agent Hohn asked what month of the year it was when he photographed his stepdaughter, Thill replied he could not remember. *Id.* at

26

145. When Special Agent Hohn asked whether Thill had masturbated to the photos, Thill responded, "No." *Id.* at 146. Thill also denied photographing his wife or younger daughter in that same manner. *Id.* at 146-47. This exchange shows that Thill's will was not overborne because Thill stated he could not remember certain details (what month of year he filmed his stepdaughter) and also denied some allegations (such as masturbating to the photos).

Thill also demonstrated remorse and guilt after confessing. *See id.* at 144 (Responding "Oh, God, yes. Oh God, yeah" to Special Agent Hohn's question of whether he felt shame about his photos of his stepdaughter); *id.* at 146 (describing the "overwhelming" feelings of guilt and of "being a pile of crap"); *id.* at 147 (stating "how far I've fallen"); *id.* at 151 (Thill confirming that he believes himself to be a bad guy). This evidence suggests Thill made these confessions voluntarily. *See Williams*, 576 F.3d at 869 (noting suspect repeatedly acknowledged responsibility for his conduct). Additionally, Thill agreed to write an affidavit confessing to taking photos of his stepdaughter and explaining that he deleted the photos quickly after, even though he declined to write an apology when Special Agent Kollars recommended Thill apologize to the children in the pornography. *See* Docket 67 at 135-38, 148.

Considering all of Thill's actions and statements together, the court finds that Thill acted voluntarily when making his confessions. Simply put, this case is not the "rare" instance in which a suspect's statements are involuntary despite officers properly advising him of his *Miranda* rights. *See Williams*, 576 F.3d at 868. The court overrules Thill's objection regarding his statements to

27

Special Agent Hohn after the polygraph examination.

## II.   **Evidence from Thill's cellphone**

The Fifth Amendment prohibits the introduction of evidence derived from involuntary statements. *See Chavez v. Martinez*, 538 U.S. 760, 769 (2003). But it does not require the suppression of physical evidence derived from voluntary statements. *See United States v. Villalba-Alvarado*, 345 F.3d 1007, 1013 (8th Cir. 2003). Here, Thill's statements in the basement to agents were voluntary under the totality of circumstances as discussed above. Thus, because evidence from his Samsung Ultra cell phone came as a result of voluntary statements under the Fifth Amendment, the court does not exclude such evidence.[5] The court overrules Thill's objection to the contrary.

### CONCLUSION

The court adopts Magistrate Judge Duffy's recommendation as modified and denies Thill's motion to suppress. The court overrules all of Thill's objections because Thill voluntarily gave all of his statements to agents. Thus, it is

---

[5] The Government further argues that even if Thill's statements giving the code to his cell phone were involuntary, exclusion would be inappropriate because of the inevitable discovery doctrine. *See* Docket 54 at 8. Because the court finds that Thill's statements in the basement were voluntary, the court need not decide this issue.

ORDERED that the Report and Recommendation (Docket 61) denying Thill's motion to suppress is adopted as modified by this opinion. The motion to suppress (Docket 48) is denied.

Dated May 3, 2023.

BY THE COURT:

/s/ *Karen E. Schreier*

KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE